# ESTATE OF REBECCA CRIDLAND, DECEASED.

### APPEAL BY MIRIAM HELE FROM THE ORPHANS' COURT OF PHILADELPHIA COUNTY.

Argued January 30, 1890—Decided February 24, 1890.

(a) By a will, directing the conversion of a residuary estate, it was provided that it should be invested in trust in productive real estate, well secured ground-rents, mortgages, etc., after approval thereof on prior application to the Orphans' Court having jurisdiction of the accounts.

(b) Under the advice of counsel, the trust estate was invested in United States bonds, payable at the option of the government at the end of five years, but not at the pleasure of the holder until the end of twenty years. For these bonds a premium was paid.

(c) At the time the purchase was made, it was believed by capitalists that the option of the government would not be exercised; but at the end of five years the bonds were called in and paid off by the government at their par value:

1 In such case, it was not error, on the adjudication of the trustee's accounts, to refuse to surcharge with the amount of the principal alleged

to have been lost by the investment in the bonds at a premium, although the investment had been made without previous application to the Orphans' Court.

2. The only effect of the failure to first obtain the approval of the Orphans' Court, was to throw upon the trustee the burden of showing that the investment was such as the law permitted, and that in the light of existing circumstances there was no imprudence in making it; this had been shown beyond question: Per PENROSE, J.

Before STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 173 July Term 1889, Sup. Ct.; court below, number and term not given.

On February 8, 1889, the account of the Pennsylvania Company for Insurance on Lives and Granting Annuities, trustee of Rebecca Cridland, deceased, under the will of Miriam Cridland, was called for audit.

At the hearing before the auditing judge it was made to appear that Miriam Cridland, by her will duly admitted to probate in February, 1858, gave the sum of $15,000, or one sixth of her residuary estate, to her daughter Rebecca Cridland, for life, with remainder to the children and issue of her said daughter, and in default of such children or issue, then to her heir or heirs under the intestate laws. Rebecca Cridland died on December 31, 1888, intestate and without issue, her heirs under the intestate laws being a sister, Miriam Hele, to whom letters of administration upon her estate were granted, and a number of nephews and nieces, children of deceased brothers and sisters.

At the close of the hearing on the testimony, the auditing judge, PENROSE, J., filed the following adjudication:

The amount received by the accountant as trustee, upon the settlement of the account of the executors of the estate of the testatrix, was $14,715. It was received March 6, 1868, and on the 25th of the following month, $14,636,75 were invested in the purchase of $13,850 United States 5.20 loan of 1865, viz.: $5,000 at $5,300, and $8,850 at $9,336.75. This loan was payable, principal and interest, in gold.

On January 10, 1877, nearly nine years after the investment,

### Adjudication.

the $8,850 loan was called in by the government, and, by reason of the premium on gold at the time, the amount received by the accountant was $9,331, or $44.25 more than the sum invested. Of these moneys, $9,310.11 were re-invested on the 14th of the next month, February, 1877, in the purchase of $8,300 United States 5-20 loan of 1867.

The $5,000 5-20's, bought in April, 1868, were called in by the government on October 20, 1877, and the premium on gold having fallen, the amount realized was but $5,131.25, or $168.75 less than the sum invested. Of these moneys, $4,400 were re-invested December 7, 1877, in a ground-rent of $264 per annum.

The $8,300 5-20 loan, purchased in February, 1877, was called in by the government May 7, 1879; and gold having ceased to command a premium, the amount received by the accountant was simply the face of the certificate, $8,300, or $1,010.11 less than the sum invested; and with these moneys and part of the balance of the proceeds of the $5,000 5-20's, $8,900 United States five per cent loan were purchased, July 27, 1879, at $8,977.88. This was held until October 14, 1886, when the loan was called in at par, there being thus a loss of $77.88 of the principal so invested.

It was contended on behalf of the distributees, that in making these investments in government loans the accountant acted imprudently and contrary to the directions of the testatrix, and that, consequently, the amount of principal thus lost, $1,212.49 ($168.75, $1,010.11, $78.88, less $44.25) must be surcharged and added to the balance shown by the account.

By the fifth clause of her will, the testatrix, after providing for the conversion of her residuary estate into cash, directed that "the said corporation, my executor hereinafter named, shall and will invest the same separately in the purchase of productive real estate, well secured ground-rents, or upon mortgages of unencumbered real estate situate in the city of Philadelphia, or otherwise securely place out the same separately at interest, and shall and will collect, recover and receive the rents, issues, interests and dividends thereof, respectively, and, after deducting thereout severally the amount of taxes, charges and expenses of necessary repairs, pay over the residue of each share when and as received."

Adjudication.

By the eighth clause, it was provided that sales of real estate constituting part of any share held in trust under the will, might be made, " and the proceeds invested in the purchase of other productive real estate, well secured ground-rents, or placed out at interest upon first mortgage or other good and sufficient securities, which shall be held by the said corporation, my executor, upon the same trust and with the same power for sale and charge thereof."

The ninth clause of the will is as follows : " It is my will, and I hereby ordain and direct that any and all investments to be so as aforesaid made for the use and benefit of said trust estates respectively, shall be first duly approved of by the Orphans' Court for the city and county of Philadelphia."

It was conceded that all of the investments except that of July 27, 1879, were made without previous application to the Orphans' Court,—the accountant having been advised by counsel that such application was unnecessary so long as the contemplated investment was one authorized by the act of assembly and that no inquiry or investigation of title, etc., was required.

Mr. Lindley Smyth, president of the Pennsylvania Company for Insurance on Lives and Granting Annuities, the accountant, testified that, during the period in which the investments were made, mortgages such as they, as trustees, were willing to accept as proper securities were very difficult to procure, and that in his judgment and that of the directors of the institution, the 5-20 loans were very desirable. The estimate in which these loans were held by the public is shown by the prices ruling before and after the purchase of February, 1877, viz.:

| 1877. | Opening. | Highest. | Lowest. | Closing. |
|-------|----------|----------|---------|----------|
| January, | $113\frac{3}{8}$ | 114 | $112\frac{1}{4}$ | 113 |
| February, | $112\frac{5}{8}$ | $113\frac{1}{4}$ | $111\frac{3}{8}$ | $111\frac{3}{8}$ |
| March, | $111\frac{1}{4}$ | $112\frac{5}{8}$ | $111\frac{1}{4}$ | $111\frac{1}{4}$ |
| April, | $111\frac{5}{8}$ | 113 | $111\frac{3}{8}$ | $112\frac{5}{8}$ |
| May, | 113 | $114\frac{5}{8}$ | 113 | $113\frac{5}{8}$ |
| June, | 113 | $113\frac{1}{4}$ | $112\frac{5}{8}$ | $112\frac{1}{4}$ |

These loans, it will be recollected, were not demandable by the holder until twenty years from the date of issue, though they were payable, at the option of the government, at the ex-

Adjudication.

piration of five years. It was not believed by capitalists, however, that this option could be exercised, except as to the comparatively small amounts of the earlier loans, for the reason, as supposed, that there would not be the means requisite for the purpose, the amount of the issue of 1867 being, according to the evidence, $310,622,750.

The condition of affairs at the time of this investment was well shown by letters written by Mr. Smyth to a gentleman living in France, for whom the company had the care of a large estate. In one of these, written in November, 1876, it was said: " The outlook for business in 1877, is very gloomy. We have never known a more difficult time for investment of trust funds in our care. Philadelphia 6's sold yesterday at 115, and this, with its enormous debt. Taxes must of necessity be increased. After a careful survey of the situation, my directors have decided that the securities which will shrink the least and are the safest and best to buy are United States 5-20's of 1868, and, failing that, of 1867, which are not payable until 1887 or 1888 ; and, although at the option of the government until then, we think the 6's due in 1881 will be paid first. I have, therefore, bought $200,000 of these securities, and you will notice that I have taken $30,000 of the 1868's for you. They cost 114.55 and accrued interest."

In April, 1877, he again wrote : " The United States bonds bought for you in November were the 5-20's of 1868, redeemable at the option of the government after 1873, and payable in 1888, July 1. Those bought for you February 15, were the 5-20's of 1867, and mature one year earlier. The loan of 1868 is small, amounting to but $34,473,800, whilst that of 1867 amounts to $310,622,750. The 1868's are therefore more desirable, but difficult to procure."

Subsequently to the investment of February, 1877, a new loan, at 4 per cent, was created by the government, and its extraordinary success in having this taken furnished it with funds, and enabled it to do what at the time of the investment seemed to the ordinary mind impossible. The views of capitalists on this subject appear from a letter written by Mr. Smyth to his French client, January 24, 1879, in which it was said: " The taking of the United States 4 per cent loan is without precedent; and now the new syndicate, Rothschilds, Seligman,

Adjudication.

Morgan, Morton & Co., are to take the rest and place it in Europe, and thus the treasury can pay off in this year the 67's, 68's, and 10-40's. If this be accomplished, it will be more than any country has heretofore been able to do in any age. Meanwhile, what can one do in the investment of trust funds?" The facts stated in this letter are matters of history, of which the court might well take judicial notice.

A trustee is not required to be infallible in his judgment, nor to possess the power of anticipating events not generally looked for. Common prudence and common skill are all that is demanded; and if these are exercised, a loss arising must be borne by the estate which the testator, who is supposed to have contemplated such risks, has thought proper to confide to his care. The difficulty of procuring investments proper for trust funds, as our daily experience in this court has taught us, has been very great for a long period of years, and when this investment was made, there seemed to be nothing so well suited for the purposes of the estate, yielding as it did the largest income for the tenant for life, affording, as supposed, perfect security to those ultimately entitled to the principal, and at the same time being in a shape which permitted conversion for distribution, the moment the life estate terminated. The only question therefore is, whether the trustee is made liable by reason of not having applied to the Orphans' Court before making the investment.

It is to be observed that the will of the testatrix gives authority to make investments of a character which, ordinarily, cannot be made without an investigation by the court, or at all, viz.: in productive real estate, well secured ground-rents, mortgages of unencumbered real estate, or otherwise; and the generality of her subsequent direction with regard to the preliminary approval by the Orphans' Court may well be restricted to such investments as these. Verba generalia restringuntur ad habilitatem rei. The acts of assembly provide for the investment of trust funds in government, state or municipal loans; and, as no inquiry is required with regard to the security thus accredited, an application, which would have been granted as of course, would have been purely a matter of form, productive only of expense to the estate. That the authority would have been granted by the court, is shown by the fact

### Adjudication.

that two years later, after the investment of February, 1877, had been paid off, leave was granted to invest in the 5 per cent government loan. This was on July 19, 1879, and the investment of July 27th of that year, was in pursuance of it. The application thus made was not because of any provision in the will of the testatrix, but simply because of the reasons set forth in the petition; numerous others of the same character having been presented and allowed with regard to other estates where there was no will suggesting or requiring the approval of the court. These reasons were as follows :

"Your petitioners have vainly endeavored to procure investments of the funds satisfactory to them. Mortgages are exceedingly difficult to procure, and all good 5 and 6 per cent legal securities are selling at large premiums. Your petitioners' judgment does not favor an investment, saving under exceptional circumstances not existing in the present case, in the United States 4 per cent loans, which are long time loans, because a change in financial affairs, which is not improbable, may bring about a greater demand for money, a raising of the rate of interest, and a depreciation to an extent difficult of calculation in the price thereof. Under these circumstances, therefore, after much anxious investigation and reflection, your petitioners are of the opinion that the best possible mode of investing trust moneys, or a considerable portion thereof, at the present, is by purchasing the 5 and 6 per cent loans of 1881, provided the purchase can be so arranged as to apportion the income justly.

"A reduction of interest payable to cestuis que trust for life, for the present seems forced upon your petitioners, but they do not admit that such reduction must continue for more than a few years longer. If they invest in the 4 per cents, the cestuis que trust may be obliged to receive for the future, if a change for the better occurs, interest much below what may again become the usual rate, and the remaindermen may be compelled to submit to a large loss in the realization of their principal. For these reasons, your petitioners strongly favor such an investment as will only compel them, temporarily, to submit to the present low rate of interest. . . . . Your petitioners therefore pray for leave to invest the moneys in their hands, belonging to the above-named trust in 5 per cent and 6 per

cent loans, of the United States of 1881, under the restriction that they shall only pay to the cestuis que trust, who shall be entitled to the income thereof, out of the interest they shall receive, interest at the rate of 4 per cent per annum on the loans they shall purchase, to commence from the date of the purchase and to run until the date fixed in the bonds for their maturity, viz.: for the 5's to May 1, 1881, and for the 6's to to June 30, 1881, it being ordered that all interest collected in excess of the rate so to be paid to the cestuis que trust, shall be carried to account of principal, in order to save the principal as far as may be, from loss by reason of the purchase at a premium."

The decree was in accordance with the prayer. The idea of taking part of the income to reimburse loss of principal seems to have been suggested by the recent experience with regard to anticipation of payment by the government, and up to that time such course was entirely novel.

While the approval of the court, if asked for in advance, would have effectually protected the trustees in case of subsequent loss, it by no means follows that the failure to apply to the court is in itself sufficient to cause such liability. The only effect, in the opinion of the auditing judge, of such failure, is to throw upon the trustee the burden of showing that the investment was such as the law permits, and that in the light of circumstances existing at the time it was made, there was no imprudence in making it. This has been shown beyond all question.

Irrespective of these considerations, the fact that the accountant acted under the advice of counsel is, in itself, enough to free it from liability, the matter being one as to which the client had the right to rely upon such advice.

The auditing judge has not been asked to reimburse to principal, out of the arrears of income which have been awarded to the estate of the tenant for life, the amount of loss on the investment under the decree referred to of July, 1879. This may have been because of the insignificance of the sum, $77.88; or, because the parties entitled to principal are also entitled to the estate left by the tenant for life.

A distribution having been ordered in accordance with the

foregoing, Miriam Hele, administratrix of Rebecca Cridland, deceased, filed exceptions alleging that the auditing judge erred:

In not charging the accountant with the amount of principal lost by the investment of the funds in United States bonds at a premium, which were subsequently paid off at par; (*a*) because the share of said Rebecca Cridland was given to the accountant in trust to securely invest the same in the purchase of productive real estate, well secured ground-rents, or upon mortgages on unencumbered real estate, etc.; and (*b*) because all investments made for the use and benefit of the trust estate were required first to be duly approved by the Orphans' Court, etc.

These exceptions, upon argument before the court in banc, were dismissed and the adjudication confirmed, without opinion filed. Thereupon the exceptant took this appeal, assigning the dismissal of her exceptions and the confirmation of the adjudication for error.

*Mr. Joseph T. Taylor* and *Mr. George Northrop*, for the appellant.

Counsel cited: Lechler's App., 21 W. N. 505; Shields' Est., 14 Phila. 307.

*Mr. John G. Johnson*, for the appellee.

Counsel cited: Section 14, act of March 29, 1832, P. L. 193.

PER CURIAM:

There was no error in refusing to surcharge the accountant with the amount of principal alleged to have been lost by the investment in United States bonds at a premium, which were subsequently called in and paid off at par. For reasons given at length in the opinion of the learned auditing judge, PENROSE, J., the Orphans' Court was clearly right in dismissing the exceptions, and confirming his adjudication.

Decree affirmed, and appeal dismissed, at the cost of appellant.