Seamans' Estate.

Argued January 23, 1939.   Before KEPHART, C. J.,
SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Frederick H. Spotts,* with him *David W. Phillips,*
of *Phillips & Phillips,* and *Pepper, Bodine, Stokes &
Schoch,* for appellant.

*Stanley F. Coar,* with him *David J. Reedy,* for ap-
pellee.

OPINION BY MR. JUSTICE STERN, March 22, 1939:

This case is concerned with the liability of a fiduciary
for failure to convert nonlegal securities.

Harry W. Seamans died January 14, 1929, intestate,
survived by a widow, an adult child, and four minor
children.   By the decree of the orphans' court distribut-
ing his estate there was awarded in kind to Wendell P.
Evans, duly appointed guardian of the four minors, a
number of securities consisting of common stocks.[1]

---

[1] Anthracite Trust Co., Atchison, Topeka & Sante Fe Ry. Co.,
Delaware & Hudson Co., Delaware, Lackawanna & Western R. R.
Co., Dime Bank-Lincoln Trust Co., First National Bank of Nichol-
son, General Electric Co., Glen Alden Coal Co., Great Northern
Ry. Co., pfd., Illinois Central R. R. Co., Industrial Thrift & Loan
Corp., National City Bank of New York, Southern Pacific Ry. Co.,
Southern Ry. Co., Third National Bank and Trust Co. of Scranton,
Thrift & Industrial Loan Corp., Union National Bank of Scran-
ton, United States Steel Corp.

Evans came into possession of these on September 2, 1930. He did not file an inventory. The oldest minor, William H. Seamans, whose estate is the subject of the present litigation, came of age on April 22, 1936. On November 12, 1936, after a citation had issued, an account was filed by Scranton-Lackawanna Trust Company as agent for the guardian, but it was subsequently withdrawn and the guardian himself filed an account on July 16, 1937, to which exceptions were filed by the ward. Most of these were directed to improper retention of the stocks, which had greatly depreciated in value. The court below decreed a surcharge of $45,-172.47. The present appeal is by the guardian from that decree.

Pronouncements as to the duty of executors, trustees and guardians to sell nonlegal securities which come into their hands as part of the original trust estate have necessarily been couched by the courts in somewhat vague phraseology, and usually with the admonition that each case must depend largely upon its own circumstances. General phrases culled from judicial opinions cannot be accepted, therefore, as sufficiently precise to enable a fiduciary to determine therefrom his exact responsibility under various conditions. There is no arbitrary or standardized formula which can be used as an inflexible measuring rod. The most that can be said as the result of a study of the authorities is that from them certain principles emerge which, in a broad sense, are applicable to this class of cases.

"The rule with regard to the duty of a trustee, into whose hands investments made by the testator himself may come, differs very greatly from that which governs him in making his own investments. In the latter case he becomes liable if he deviates from the line marked out by the law, should a loss arise. In the former case much is left to the discretion of the trustee, and if in the honest and proper exercise of that discretion, he de-

lays the realization, he may not be held liable for any loss arising from such delay": *Coggins' Appeal,* 3 Walker 426, 427. In *Stewart's Appeal,* 110 Pa. 410, 425, it was intimated that a fiduciary need exercise only "the ordinary judgment of an ordinarily prudent person," and could be held liable only if guilty of supine negligence. "The law requires common skill, common prudence and common caution, in the administration of estates by trustees. It has been held over and over again that executors, administrators and guardians are not liable beyond what they actually received unless in case of gross negligence": *Dauler's Estate,* 247 Pa. 356, 359. A similar rule was stated in *Borell's Estate,* 256 Pa. 523. In *Taylor's Estate,* 277 Pa. 518, 526, it was said, quoting from Perry on Trusts, that "the fact that the testator has invested his property in certain stocks . . . will not authorize trustees to continue such investments beyond a reasonable time for conversion and investment in regular securities," and the principle was announced (p. 528) that "ordinarily a fiduciary has no right to retain, beyond a reasonable period, investments made by the decedent in unauthorized securities, unless specially empowered so to do; . . . when a trustee continues to possess such nonlegal investments after a time when he could properly dispose of them, and a loss occurs, he may be held liable for a failure of due care, unless he shows that his retention of the securities in question represents, not a mere lack of attention, but the honest exercise of judgment based on actual consideration of existing conditions; in other words, he is expected to be ordinarily watchful and to exercise normally good judgment" In *Brown's Estate,* 287 Pa. 499, the court said (p. 502), speaking through the present Chief Justice: "They [fiduciaries] need not rush into a conversion of the securities left by the decedent and, under the whip of the law, sell them below what they might normally expect to receive from them, thus causing an estate to

shrink out of all proportion to any possible benefit that might arise through a strict application of the rule. . . . In considering the sale of investments that have no open market, or bonds in a depressed market, or stock whose intrinsic value is established, paying dividends equal to and above what would be a normal interest rate, reasonable latitude, according to the circumstances, must be allowed a fiduciary in the disposition of such property." Among recent cases see *Dempster's Estate*, 308 Pa. 153; *Mellier's Estate*, 312 Pa. 157; *Curran's Estate*, 312 Pa. 416, 423, 424; *Macfarlane's Estate*, 317 Pa. 377, 383, 384; *Kelch's Estate*, 318 Pa. 296; *Reinhard's Estate*, 322 Pa. 325; *Gardner's Estate*, 323 Pa. 229. In Restatement of Trusts, section 230, the rule is thus stated: "Except as otherwise provided by the terms of the trust, the trustee is under a duty to the beneficiary within a reasonable time after the creation of the trust to dispose of any part of the trust property included in the trust at the time of its creation which would not be a proper investment for the trustee to make."

Nothwithstanding the broad tenor of some of the language thus quoted, a fiduciary is not justified in inferring that the principle which exempts him from liability for acts performed in good faith and with ordinary prudence necessarily applies wherever there is a failure to convert nonlegal securities within a reasonable time. The law imposes limitations upon "ordinary prudence" in such cases in order to preserve the differentiation between nonlegal and legal securities, and between fiduciaries and others as to the right to speculate. The mere fact that a trustee may honestly believe that an unauthorized security will appreciate in value at some more or less remote period is not sufficient justification for his retention of it in the trust estate, and "common prudence" or "normally good judgment" must not be deemed to confer such latitude of discretion. It is within the power of a testator or settlor to provide that the trust

estate established by him may retain nonlegal securities, and his failure to make such a provision leads naturally to the conclusion that it was his desire that the law should take its course and the estate be invested in securities authorized for the investment of trust funds; this is especially true where the trust is to continue over an extended period of time.

As definitely as general rules may safely be formulated,—there being, as already pointed out, no rigid criterion,—the law may be thus stated:

1. If a fiduciary receives nonlegal securities as part of the trust estate, he is vested by law with a measure of discretion and allowed to some extent to exercise his own judgment as to the wisdom of selling the securities under prevailing market conditions. However, in the absence of exceptional circumstances, he should convert them promptly.[2] This does not require that he sell them *immediately*, as "under the whip of the law," but it means that he should not continue to hold them indefinitely merely because he believes that they will appreciate in value and would therefore retain them if they were his own securities.[3]

---

[2] "When there is a duty to convert trust property, the conversion must be made within a reasonable time after the creation of the trust. Ordinarily any time within a year is reasonable, but under some circumstances a year may be too long a time and under other circumstances a trustee is not liable although he fails to effect the conversion for more than a year. Thus, if there is a ready market for the property, it would usually be improper to delay the sale for a year. If, however, the property even though it has a ready market could not be sold except at a sacrifice, it may be proper for the trustee to delay the sale for more than a year. The question in each case is whether under all the circumstances the trustee acted with prudence in delaying the sale": Restatement of Trusts, section 230, comment b. See *Hughes v. Empson*, 22 Beav. 181.

[3] The Fiduciaries Act of 1917, P. L. 447, section 49(e) 2, provided that "Where stocks, bonds, or other securities have been distributed in kind . . . to any fiduciary, it shall be the duty of

2. Under certain circumstances a fiduciary is excused from the prompt sale of nonlegal securities which is otherwise required. Such circumstances cannot be completely catalogued; they must be considered in each case as they arise. Among them may be mentioned instances where the market is so restricted that it is reasonably impossible to sell the security; or where the offering of a large block of stock at one time would drastically break the market price; or where a security is abnormally depressed in value because of a general economic and financial collapse, so that a sale can be effected only at a sacrifice, but there is a reasonable likelihood of an early return to stable conditions which will restore the normal value. A fiduciary is not compelled to jettison seasoned investments during a temporary panic. Other exceptions to the general rule are where the will or other instrument creating the trust grants powers broad enough to justify the retention of the securities, or where the beneficiaries of the trust themselves request or agree to such retention.

In the present case the court below was of the opinion, amply justified by the testimony, that appellant did not

such fiduciary to use reasonable diligence in converting such securities as shall not be investments now or hereafter authorized by law." The Act of May 28, 1937, P. L. 1037, section 3, amending section 41, par. 1, clause a, subsection 13, of the Fiduciaries Act (as added by Act of July 2, 1935, P. L. 545) provides that the fiduciary shall not be liable if he "exercises due care and prudence in the disposition or retention of any such nonlegal investment." Section 4 eliminates the clause in the Fiduciaries Act requiring the use of reasonable diligence, and provides that if the fiduciary be doubtful as to the propriety of selling the securities he may apply to the orphans' court for authority and direction to retain them. It is unnecessary to consider the effect of this later legislation as it was not retroactive and is therefore not applicable to the present case. It may be pointed out, however, that even this statutory standard of "due care and prudence" in the retention of nonlegal investments calls for judicial interpretation, and may properly be construed as requiring conformity with the general rules above stated.

give to the management of the trust estate the care and judgment which he should have exercised. He sought no legal advice until after he was cited to file an account, and he seems to have had somewhat hazy ideas as to his duties. In August, 1931, he turned over the possession of the securities to Scranton-Lackawanna Trust Company, under an agreement by which that company was to collect the interest and dividends but make sales and reinvestments only as appellant should approve.[4] The agreement provided that the company was periodically to review and examine the securities and make recommendations to appellant, and apparently the latter felt that he was thereby relieved of the duty of keeping a watchful eye on the situation and determining for himself if and when the nonlegal securities should be sold. It is true he testified that from time to time he consulted with officers of the company, spoke to bond salesmen, and kept in touch with market prices, but a reading of the record does not give the impression that he was seriously concerned with the responsibilities which his office as guardian imposed. The reasons which he advanced at the hearing why he never sold the nonlegal investments are far from convincing. This much, however, can be said for appellant,—that when he obtained possession of the stocks in September, 1930, the country, as we all know, was in the throes of an unprecedented, catastrophic depression which had continued with increasing intensity since October, 1929. Securities were constantly falling in market value, and there prevailed a confusion in the financial world which laymen and experts alike were unable either to diagnose or to remedy. Moreover, the psychology of the period must be taken into consideration. There existed a general impression that normality would soon be restored and that pros-

---

[4] In fact, however, the trust company purchased certain mortgage participation certificates for the estate without consulting appellant, but they were subsequently sold without loss.

perity was "just around the corner." Even the most prudent men, not foreseeing that still worse times were ahead, optimistically retained their failing investments. Under such circumstances appellant is not to be censured for failure to comply with the rule ordinarily requiring prompt conversion, and we are of the opinion that the court below erred in surcharging him, as it did, with the value of the nonlegal securities as of the very day, September 2, 1930, when they came into his possession. Such a surcharge is unreasonable. On the other hand, we find no adequate excuse for appellant's retention of the stocks ever since 1930. The dividends on practically all of them were constantly being diminished, and during 1931 and 1932 ceased altogether. Market prices slumped more and more. Certainly by the end of a year after he received the stock,—two years in all after the depression started,—appellant should have realized that the probable duration of the depression could not be foretold, but that it certainly was not merely a temporary condition and that any conclusion as to whether stocks would recover or sink to still lower levels could be based only on guesswork. Under such circumstances a person might handle his *own* securities as he thought best, but the purpose of the law is to prevent a *fiduciary* in such a situation from speculating. The safe, proper, and only recourse for appellant was thereupon to convert the estate into authorized investments. We hold, therefore, that, while a surcharge was warranted, it should have been based upon the value of the stocks as of September 2, 1931, instead of September 2, 1930. This grants him all the time for conversion to which even the unusual conditions then prevailing entitled him.

Some of the stocks, not listed on the exchange or sold over the counter, require special consideration. The testimony indicated that Anthracite Trust Company stock had but a thin market during 1931, but the number of shares in the estate was small and no doubt could have

been disposed of. The same observation applies to the stock of Third National Bank and Trust Company of Scranton. The estate had larger. holdings in Dime Bank-Lincoln Trust Company, but there existed a sufficiently active market in this stock to have enabled appellant to dispose of it before September, 1931. These stocks, therefore, should all be charged to appellant at their September 2, 1931, values. On the other hand, the evidence established that there was no available market for Union National Bank of Scranton stock and this surcharge cannot be sustained; it follows also that appellant was entitled to the credit, allowed by the court below, of $650 which was levied as an assessment on the Union National Bank stock.

Appellant's exception to the surcharge with regard to the Thrift and Industrial Loan Association stock has no practical basis because the court nullified the surcharge by allowing a deduction therefrom in an equal amount as representing the liquidating dividends received and the loss incurred on this stock.

A net surcharge of $90.10 was made in the case of the Industrial Thrift and Loan Corporation stock. This was improper because the liquidating dividends received were more than could have been realized had the stock been sold at its market value in September, 1931.

As far as the First National Bank of Nicholson stock is concerned, no exception to the account was filed and no testimony taken in regard to it; this surcharge, not having been claimed, must be set aside.

The court below, in its opinion, stated that commissions for the guardian and fees for his counsel "cannot be allowed," but no surcharge was actually included in the decree to cover the fees paid to counsel and the commissions taken by appellant on the receipts of income; there is therefore no basis for appellant's assignments of error as to these items. The court properly refused his request for an allowance of $2,870 as commissions

on principal, because his negligent and improper administration of the estate disentitled him to compensation.

Other assignments of error need not be considered because they relate to items as to which no surcharges were in fact imposed.

The record is remanded in order that the amount of the surcharge may be modified in accordance with this opinion. Costs to be divided equally between appellant and the ward's estate.

DISSENTING OPINION BY MR. JUSTICE SCHAFFER:

I would make no surcharge. We are here dealing with a situation which might well confound any man. The guardian received the securities when the financial walls were falling. He did not make the investments himself. He did what, it seems to me, was the most prudent thing he could do, sought the aid and advice of one of the principal financial institutions of the community in which he lived to help him solve the problem with which he was confronted, whether to sell the securities at what seemed terrible sacrifices or to hold them. This I think was not speculating; it was in the exercise of judgment. Many of the securities were of local institutions. Experience shows that in the smaller towns these cannot be sold for anything like their intrinsic value. Other of the securities were of the country's standard railroads and industrial concerns. No prudent person, unless compelled to do so, would have sold these securities at the distress figures of 1931.

I think the case should be viewed, not retrospectively, but from the position in which the guardian found himself in the upset financial world, and, so viewed, I cannot say he did not exercise "normally good judgment" and common skill, common prudence and common caution.