Quinn's Estate.

Argued May 14, 1941. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*George V. Strong,* of *Strong, Saylor & Ferguson,* with him *Larzelere & Wright,* for appellants.

*Desmond J. McTighe,* of *Fox & McTighe,* with him *Francis X. Quinn,* for appellee.

OPINION BY MR. JUSTICE LINN, June 30, 1941:

Mrs. Harty, life beneficiary, and the guardian ad litem of her minor children, appeal from a decree refusing to

surcharge the testamentary trustees of her father's estate for losses said to have resulted from negligent administration of the trust property.

James Quinn died May 12, 1929, leaving surviving three sons, Thomas, Joseph and Francis, and a daughter, Mrs. Harty. By will and codicil, after gifts which need not be stated, he gave outright 2/6 of his property to Thomas, 1/6 to Joseph, 1/6 to Francis and "two-sixth interest in all the rest, residue and remainder of my Estate, real and personal, unto the Executors named in my said last Will and Testament, IN TRUST NEVERTHELESS, to invest and reinvest the same and to pay the net income therefrom in quarterly installments to my said daughter, Marie S. Quinn, during her natural life, and from and after her death, I give, devise and bequeath the principal of said two-sixth interest unto her lawful issue, but in default of such issue I give, devise and bequeath the said principal in equal shares to my said sons, Thomas A. Quinn, Joseph A. Quinn and Francis I. Quinn, their heirs and assigns." He appointed his son Thomas and James A. Flaherty of Philadelphia executors and trustees. Thomas Quinn was employed as an accountant by the Pennsylvania Railroad Company; Mr. Flaherty is described in appellants' brief as a "competent lawyer." Testator's property consisted principally of investments in real estate and in the shares of two trust companies, the Continental-Equitable and the Integrity. His personal estate was inventoried at $234,800, of which over 50% was invested in the trust company stocks. The executors' account was adjudicated in June, 1930. An unsigned copy of an agreement dated January 13, 1930, requesting the retention of testator's investments, was put in evidence with the stipulation that the original, which could not be found, had been signed by testator's three sons. The sons, the daughter and the trustees, certified in writing that they had examined the Schedule for Distribution—proposing distribution in kind—and asked the court to approve

it. Approval was given June 18, 1930. Joseph and Francis each received 175 shares of Continental-Equitable and 70 shares of Integrity stock, Thomas received 350 shares of Continental-Equitable and 140 shares of Integrity and the Trustees 350 shares Continental-Equitable and 140 shares of Integrity. This distribution in kind, made pursuant to the adjudication, was not questioned within five years; it may not be challenged now: *Elkins' Estate*, 325 Pa. 373, 190 A. 650. The more important claims to surcharge are made in consequence of the action of the trustees in thereafter holding the trust company stocks.

The trustees entered on the performance of their duties, Mr. Flaherty with his office in Philadelphia and Mr. Quinn residing in Montgomery County. In consequence of Mr. Flaherty's death January 2, 1937, his executrix and the surviving trustee, Mr. Quinn, joined in the trustees' account at the audit of which the questions now for review were decided.

The trust company stocks were non-legals in the retention of which, after June, 1930, the minors had not acquiesced. The effect of retaining them, pending the decision to sell, imposed on the accountants the burden of proving that they acted with due care in administering the trust. The rule is satisfied by the conduct of the prudent man in like circumstances: see *Casani's Estate*, 342 Pa. 468 and cases there cited.

It should be kept in mind that the distribution was made during the period of depression for bank stocks culminating in the bank holiday of 1933. The companies continued to pay regular dividends, the Continental-Equitable until it was taken over by the Pennsylvania Company in December, 1931, and the Integrity into 1932. Mr. Quinn was asked: "Q. As soon as he would get the dividend check he would mail it to you, wouldn't he? A. Not necessarily, sometimes he sent and told me that he had the check for me, or I would go in. I went in there quite often ordinarily. It was not necessarily

the case that Mr. Flaherty called me up. . It wasn't necessary for Mr. Flaherty ordinarily to call me. In other words, I kept in very close touch with him." That they discussed the trust company stocks is quite apparent from Mr. Quinn's testimony: "Q. . . . Now, so long as you got regularly quarterly dividends, during the year 1930, there arose no question in your mind about the stock, the holding of the stock, did there? A. You mean, Mr. Flaherty? Q. You. A. Me? Q. Yes. A. How can I answer that? Q. In other words, you were satisfied to hold the stock? You made no effort to sell that stock during 1930, did you? A. Well, if I said that I had a dispute about it, who is to dispute that, because Mr. Flaherty is not here? Q. I want to know what you did? A. I cannot answer you. You understand me. Q. Who held the stock certificates? A. Mr. Flaherty." Mr. Flaherty is not here to give oral evidence; Mr. Quinn is obviously now unfriendly to Mr. Flaherty's estate. The record however shows Mr. Flaherty's attention was constantly directed to the Continental-Equitable stock. He was a director of the company, and, during certain periods, was a member of the Finance Committee of the Board; his knowledge of its affairs was intimate. The stock was not listed on any Exchange. The exceptants produced evidence of private, that is, over-the-counter, sales of the stock between June, 1930, and December 6, 1931, and some public sales, mostly in small lots, by Barnes and Lofland, auctioneers, at declining prices. The Integrity stock was also unlisted; it had a slightly wider market at private sale[1] than Continental-Equitable, which dropped from $28 October, 1931, to $6 on December 3; while Integrity dropped from $34 in October, 1931, to $18 in December. Altogether, only 187 shares of Integrity were sold at public sale in 1931, and 140

---

[1] As to the advantage of a public over a private sale, see *Tyson's Estate*, 80 Pa. Superior Ct. 29, 31.

shares in 1930; relatively a very small number were sold after the date of the adjudication. Concerning the general conditions then prevailing with respect to such stocks, one of appellants' witnesses was asked, after having mentioned banks that had closed during 1930 to 1933, "Q. Would you say that banking conditions in Philadelphia were materially different from banking conditions generally, so far as you know? A. No, I would say that the whole United States was af- flicted by the same disease." During 1932, and for years thereafter the "disease" continued; the price for odd lots of Integrity at public sale in 1932, as we understand the exhibit in evidence, fluctuated between 20 and 8; in 1933 from 8 to $3\frac{3}{4}$; in 1934 from $7\frac{1}{4}$ to $2\frac{1}{2}$; in 1935 from $7\frac{1}{4}$ to $2\frac{7}{8}$; in 1936 from 14 to $6\frac{1}{2}$. The members of testator's family, who received their proportions of trust company stocks, retained them; the trustee, Thomas Quinn, retained his; they, of course, could do as they pleased with their property but, the other circumstances being alike, their retention of the stocks during the admittedly difficult period involved, is some evidence whether the trustees acted prudently. The learned court below found, on considering the administration of the trust in the familiar "depression" setting,[2] that there had been no failure in duty; there is evidence to support the finding which has the effect of a verdict by a jury: *Frank's Estate*, 339 Pa. 499, 501, 15 A. 2d 353.

During the examination of Mr. Quinn by counsel for the executrix of the Flaherty estate, a shortage in his rent collections was disclosed; it had not been suggested by the exceptions filed by Mrs. Harty or the guardian ad litem; Mr. Quinn was accordingly surcharged in the sum of $2,682.19, and it was directed that his com-

---

[2] Of which the court takes notice: see *Cridland's Estate*, 132 Pa. 479, 484, 19 A. 362; *Gardner's Estate*, 323 Pa. 229, 233, 185 A. 804.

missions should be applied in part payment. The appellants now complain that the estate of the co-trustee was not also surcharged for the same dereliction. As was stated earlier, the sons took absolutely and the daughter an equitable life interest in the real estate; Thomas Quinn became the owner of ⅖ interest in 15 houses, the trust estate of the other ⅗ interest. By arrangement with his co-trustee, Mr. Quinn, being part owner, collected the rents, attended to repairs, etc. and at times paid the collections to the trust account and at others paid direct to his sister who lived in the same house with him. There is no doubt of the right of a trustee to appoint a real estate agent to collect rents or an agent to attend to repairs; it may certainly also be done by a co-trustee.[3] The surcharge was required by Mr. Quinn's own testimony. The implication is that the learned court concluded that the breach of duty was Quinn's alone and not also that of his co-trustee, a fact which would limit the surcharge to him.

In the management of the real estate, taxes were allowed to become delinquent; to restore the amount paid in consequence, an appropriate surcharge, $463.41, was made against both trustees, the amount to be deducted from their commissions. Appellants complain that the trustees were not deprived of commissions altogether. This subject lies very largely in the discretion of the court. Apparently, the reason taxes became delinquent and required the payment of penalties and interest for which surcharge was imposed was that the trustees, during part of the time, paid over to the life tenant the gross income instead of the net income. As the amount is restored, neither life tenant, who benefited by it, nor remaindermen were harmed. There was no abuse of discretion in not depriving them of commissions on that account, nor on any other account called to our attention.

[3] Scott, Trusts, section 171.2; *Myers' Estate,* 205 Pa. 413, 54 A. 1093.

It is also contended that the learned court erred in allowing a counsel fee to the accounting executrix; much must be left to the discretion of the court: *Wood's Estate,* 272 Pa. 8, 12, 115 A. 865; *Grollman's Estate (No. 2),* 273 Pa. 565, 567, 117 A. 351; *Harton's Estate,* 331 Pa. 507, 523, 1 A. 2d 292; *Foulke's Estate,* 334 Pa. 186, 189, 5 A. 2d 179. We find no abuse of discretion.

Decree affirmed, costs to be paid one-half out of income and one-half out of principal.

CONCURRING OPINION BY MR. JUSTICE STERN, June 30, 1941:

Because of the thin market for the trust companies stocks here in question, because of their extraordinarily sharp and rapid decline in price, because the offering for sale of the comparatively large number of shares held by the estate would no doubt have still further broken their market prices (as to all of which see *Seamans' Estate,* 333 Pa. 358, 364, 366, 367, 5 A. 2d 208, 211-213), I consider that the circumstances justified the trustees in not converting these securities, and therefore I concur in the affirmance of the decree of the court below.