## Long Estate

## ADJUDICATION

TAXIS, P. J., February 21, 1973.—The account was filed because of the death of the life tenant, and the remainder, with the exception of a gift of $12,000, is now to be distributed to the descendants of decedent's brother and sisters. . . .

Objections to the account were filed on behalf of seven descendants of decedent's sisters. These objections seek to have accountant surcharged for losses sustained in the sale of shares of accountant's own stock. The objectors contend that these losses resulted from accountant's failure to sell such stock promptly after having received the same from decedent's administrator.

The objectors also requested a surcharge for loss of investment growth on the amount actually lost in the sale of accountant's stock, but objectors' position in this regard was abandoned at the time of hearing.

By his will, decedent gave the trust estate to the Commonwealth Title Insurance and Trust Company, in trust, as follows: ". . . to keep the same safely invested, and to pay the income thereof to my wife, Mary Jane, (or to her and my son Bayard, in such proportions as she shall from time to time direct,) at stated annual or semi-annual intervals, and at her death to pay the said income to my son Bayard during his lifetime, and at his death to distribute the principal of my estate, to my brothers and sisters and the descendants of those who shall have died, according to the intestate laws of the state of Pennsylvania. . . . Excepting, further, that in case my son Bayard should marry and have children, the above said estate, at his death, shall descend to them or their heirs, if any survive my said son, instead of going to my brothers and sisters and the descendants of those who may be deceased, and one-third of such sum as may be counted as principal of my estate, to any widow my said son may leave, for her life, and then to their descendants. The house at Ashbourne, and the one at Spray Beach, I wish my wife to occupy during her life and at her death my son if he survive, and at the death of the last of them to be sold and become part of my estate." The will contained no provision regarding the investment powers of the trustee.

Decedent died October 31, 1927, survived by his wife and son, Bayard. The will named no executor, and Commonwealth was issued letters of administration, c.t.a., on November 12, 1927.

On April 4, 1928, during the course of the admin-

istration of the estate, Commonwealth merged into the Provident Trust Company, corporate predecessor of the accountant. Among the assets in decedent's possession at his death were 88 shares of the common stock of Provident Trust Company, valued in the inventory at $834 per share. This asset was not converted during the administration.

The administrator's account was confirmed absolutely on January 6, 1929. Since decedent's wife had elected to take against his will, thereby becoming entitled to one-half of his estate, the adjudication awarded one-half of the balance of the principal in the estate to decedent's wife and one-half to Provident Trust Company, trustee under decedent's will. The schedule of distribution, filed pursuant to the adjudication and approved by decedent's wife and son on May 1, 1929, shows distribution of 44 shares of the Provident stock to decedent's widow and 44 shares to the trustee. The schedule also revalued the Provident stock at $864 per share, the market price on January 10, 1929.

After March 1929, the market price of the Provident stock began to decline steadily in price as follows: March, $904; April, $901; May, $884; June, $868; July, $841; August, $817; September, $803; October, $761; November, $680; December, $665. In the years following 1929, the market value of the Provident stock followed a pattern of further decline, interspersed with substantial rallies, the price ranges being as follows: 1930, 553-701; 1931, 360-620; 1932, 297-495; 1933, 300-360; 1934, 320-410; 1935, 400-507; 1936, 499-549; 1937, 415-530; 1938, 325-428; 1939, 274-372; 1940, 242-303; 1941, 232-320; 1942, 258-145.

The losses for which objectors claim a surcharge are in the amount of $25,160.58 and were realized as follows:

| Sales | Net Proceeds |
|---|---|
| 2 shs. 2/7/35 | $   855.86 |
| 2 shs. 7/31/35 | 881.86 |
| 10 shs. 5/2/39 | 3,450.00 |
| 10 shs. 5/23/39 | 3,469.30 |
| 20 shs. 5/12/42 | 4,198.40 |
| | $12,855.42 |

| Carrying Value Of Shares Sold | Loss |
|---|---|
| $  1,728.00 | $     (872.14) |
| 1,728.00 | (846.14) |
| 8,640.00 | (5,190.00) |
| 8,640.00 | (5,170.70) |
| 17,280.00 | (13,081.60) |
| $38,016.00 | $ (25,160.58) |

It has been stipulated by counsel for the accountant and counsel for the objectors that decedent's widow used some of the assets which she inherited from decedent's estate, including the 44 shares of the Provident stock, to fund a revocable trust which she established with accountant and her son as cotrustees; that the four shares sold by decedent's trust in 1935 were sold to his widow's trust; that at the death of decedent's widow on March 23, 1936, her trust still held the 44 shares which she had inherited from decedent, plus the four additional shares which her trust purchased from decedent's trust, and, in addition, she owned eight shares of Provident stock in her own name. It was further stipulated that after the death of decedent's widow, her son became the sole beneficiary under her deed of trust, with power to withdraw principal; that pursuant to that power he withdrew the 48 shares of the Provident stock which were in her trust; and that at his death, he owned 800 shares of Provident National Bank, which included

the Provident stock inherited by his mother, as increased by stock splits and mergers.

It is clear that the Provident stock was received by the trustee as a nonlegal investment. The law with regard to such investment was stated in Casani's Estate, 342 Pa. 468, at pages 471-72, as follows:

"[I]f non-legal investments are received without authority to retain them, they must be converted into legals with reasonable diligence . . . 'a fiduciary should not hold beyond a reasonable period investments made by the decedent in unauthorized securities unless specially authorized to do so, and . . . when a trustee continues to hold such non-legal investments after a time when he could properly dispose of them and a loss occurs, he must be held liable for a failure to exercise due care; *unless he shows that his retention of the securities in question represents, not a mere lack of attention, but an honest exercise of judgment based on actual consideration of existing conditions;* in other words, he is expected to be ordinarily watchful and to exercise normal good judgment . . .' 'He is thus vested by the law with a measure of discretion and is allowed the exercise of his own judgment as to the wisdom of selling the securities under then prevailing market conditions.' " (Emphasis in original.)

Counsel for the objectors has argued that accountant's retention of the Provident stock for 14 months as administrator, c.t.a., is to be considered by the court in determining whether accountant failed to convert the Provident stock within a reasonable period of time. In Lewis' Estate, 344 Pa. 586, the *accountant* argued that retention of a nonlegal investment during a previous accounting period should *excuse* the accountant for retention of the investment during the period for which the account was being audited. The Supreme Court rejected this argument as follows:

*"In the absence of objection to the administration of the item in question, within five years, confirmation of the last prior account, on January 13, 1930, effectively insulated the trustees against surcharge for failure to convert prior to that date;* it did not, however, have any effect as absolving them from liability for any loss owing to their undue retention of the non-legal securities thereafter": Lewis' Estate, supra, at 594; cf. Casani's Estate, supra, at 473. (Italics supplied.)

The issue before the court, therefore, is whether accountant retained its own stock beyond a reasonable period from the date of confirmation of the prior account in January, 1929. It is the court's opinion that the Provident stock was not, in the circumstances of this case, retained beyond a reasonable period of time.

A fiduciary receiving a nonlegal security as part of the trust estate is not required to sell it immediately as "under the whip of the law": Seaman's Estate, 333 Pa. 358, 363. Nor is a fiduciary compelled to jettison a seasoned investment during a temporary panic: Seaman's Estate, supra, at 364. Ordinarily, any time within a year is reasonable, and even though the security has a ready market, if it cannot be sold except at a sacrifice, it may be proper for the trustee to delay the sale: Seaman's Estate, supra, at 363.

While the account of the administrator, c.t.a., was confirmed absolutely in January 1929, the schedule of distribution was not approved until May 1929. Just two months later, the Provident stock was already below its account value; and the Provident stock never regained its account value thereafter. Accountant had carefully analyzed the Provident stock as an investment, even when its market value was falling, and concluded from its analyses that the stock was a sound investment, which was being carried at a reasonable price, and that the market value of the stock would im-

prove. And the stock's resistance to decline even after the historic stock market crash of October 1929, justified accountant's judgment that this was a sound, seasoned, nonspeculative security. Cf. Shipley's Estate, 337 Pa. 571, 573-74. Accordingly, the Provident stock could not be sold after July 1929, "except at a sacrifice." As in Casani's Estate, therefore, accountant was attempting to avoid a loss and eliminate the sacrifice of assets in the estate.

It is clear that the retention of the securities did not represent any lack of attention. The accountant's correspondence, diary entries and investment notes with regard to the holding of the Provident stock were introduced into evidence and consisted of some 49 pages. While these pages do not contain any diary entries or investment notes as to considerations concerning this holding during the period between 1929 and 1932, the then manager of the accountant's trust investment committee explained that the practice of regular memoranda entries in a trust account file was not established until 1932. Prior to that it was accountant's practice to have a holding card for every investment in the trust department, listing in detail the number of shares and the accounts for which each investment was held. Under this system, the market price of the Provident stock was recorded weekly on the Provident stock holding card. From the regular memoranda entries beginning in 1932, and from the testimony of the trust investment committee manager that consideration was given to the Provident stock investment during the period from 1928 to 1932, the court is satisfied that accountant gave due consideration to the holding of the Provident stock from the inception of the trust until the stock was finally disposed of. Accordingly, the retention of the Provident stock did not represent a lack of attention on the part of accountant.

The court is further satisfied that the retention of the Provident stock resulted from, in the language of Casani's Estate, an honest exercise of judgment based on actual consideration of existing conditions.

It is clear that, from the inception of the trust, the life tenant wanted the Provident stock retained in the trust. The court is aware, of course, that a trustee's responsibilities flow not only to the life tenant, but also to the remaindermen. In this case, however, the life tenant is the son of decedent. The remaindermen were still undetermined as of the time of decedent's death and might have been either his son's wife and issue, if he married and had issue, or if not, then decedent's brothers and sisters and their descendants. In this scheme of distribution, decedent's son should be considered the most favored beneficiary, and his wishes were certainly worthy of consideration by accountant.

With regard to the interest of decedent's son, accountant considered that he was a comparatively young man; that it was expected that the trust would be in his favor for a good many years; and that, at the inception of the trust, legal investments in bonds were uninteresting insofar as yield was concerned, and legal investments in reasonably safe mortgages were difficult to obtain. Based on these considerations, and considering that the Provident stock was a sound investment which could only be sold at a sacrifice, accountant decided to hold the Provident stock. This is an honest exercise of judgment based on actual consideration of existing conditions.

There are other factors supporting the court's conclusion that the retention of the Provident stock was an honest exercise of judgment based on actual consideration of the existing conditions. The court recognizes that holders of stock which is basically sound and valuable are never inclined to sell that stock in a de-

clining market; so that it cannot justly be adjudged that accountant, in not throwing the stock on the market, was not honestly and properly exercising the discretion vested in it. Cf. Shipley's Estate, supra, at 578. Accountant followed the market constantly and considered the fluctuating prices. Cf. Casani's Estate, supra, at 474. To sell the Provident stock would have, in the judgment of accountant, sacrificed the assets and jeopardized the income of the life tenant. Cf. Casani's Estate, supra, at 475. The retention of the Provident stock was not by way of speculation and there is no indication in the record that accountant was holding the Provident stock in order to receive a better price than the securities were reasonably worth. Cf. Casani's Estate, supra, at 478. The Provident stock continued to pay regular dividends. Cf. Quinn's Estate, 342 Pa. 509, 512. The knowledge of accountant's investment committee as to the value of the stock was the intimate knowledge of officers of the Provident Trust Company. Cf. Quinn's Estate, supra, at 513. Decedent's wife and son retained their Provident stock and, while they certainly have more investment freedom than accountant, nevertheless, their retention of the same stock during the difficult period involved is some evidence that accountant acted as a prudent person. Cf. Quinn's Estate, supra, at 514.

The court concludes from the above that accountant did not retain the Provident stock beyond a reasonable period, or continue to hold the stock after a time when accountant could properly dispose of it; and further, accountant's retention of the Provident stock represented, not a mere lack of attention, but an honest exercise of judgment based on actual consideration of existing conditions. Accountant was ordinarily watchful and exercised normal good judgment in retaining the Provident stock temporarily,

awaiting what accountant considered a proper time to sell.

Objectors also contend that accountant should be surcharged because losses resulted from retention of accountant's own stock. In Greenawalt's Estate, 343 Pa. 413, it was argued that it was improper for the corporate fiduciary to make an investment in its own stock and that the trustee should be surcharged for losses resulting from such an investment. The dissenting opinion recognized and agreed with the very same contention now being made by the objectors in the case at bar. But the majority opinion, after first indicating that the life tenant-cofiduciary was equally responsible for the investment and, therefore, for the loss on the investment, rejected this contention, concluding as follows:

"But the controlling fact now is that the loss resulted from the nationwide depression which closed the bank and not from the considerations generally and properly condemning investment by an accountant in its own stock": Greenawalt's Estate, supra, at 421.

Clearly, in the case at bar, the loss resulted from the nationwide depression, and there is no evidence that any loss resulted from the considerations generally and properly condemning investment by an accountant in its own stock.

In Shipley's Estate, supra, the Supreme Court opined that the Provident Trust Company was justified in considering its own stock sound and nonspeculative. While Shipley's Estate, supra, included a finding of acquiescence by the beneficiaries in the retention of the Provident stock, the opinion clearly indicates that, irrespective of acquiescence, the Provident Trust Company was not negligent in retaining the Provident stock. And while there is no indication that the court considered the propriety of a corporate fiduciary's

retention of its own stock, the failure to raise what objectors now consider so obvious an issue indicates to the court that, as the manager of accountant's trust investment committee testified, the issue of a fiduciary holding its own stock was not given great publicity or consideration until the late 1930's.

Shipley's Estate, supra, did not consider the propriety of a corporate fiduciary's retention of its own stock, and this issue was eliminated by stipulation of counsel in Lewis' Estate, supra. In both of those cases and in the case at bar, this additional issue appears to be superfluous. In all of these cases, the security is assumed to be a nonlegal investment. But the courts have nevertheless consistently held that a fiduciary should not be required to sell "immediately as under the whip of the law"; or to "jettison a seasoned investment during a temporary panic." The law, as previously indicated, is that a fiduciary must convert a nonlegal investment within a reasonable time, considering the circumstances: Casani's Estate, supra, at 472. Where an investment is also in the fiduciary's own stock, in addition to being a nonlegal investment, the fiduciary should not be required to convert the security within an even shorter period of time. Such a requirement would necessarily cause a fiduciary to sell "immediately, as under the whip of the law"; and to "jettison a seasoned investment during a temporary panic." The court does not consider this to be the law of the Commonwealth of Pennsylvania. For this reason, and for the reasons previously stated, the objections are dismissed.

Questions have been raised for adjudication concerning the proportions in which the descendants of decedent's brother and sisters are to share the balance of residue.

Decedent was survived by a brother, William H. Long, who died, without issue, during the lifetime of

Bayard Long. Decedent was also survived by another brother and a sister. Decedent had a second sister and the date of her death is uncertain, but five of her grandchildren are now living. None of decedent's brothers and sisters survived Bayard Long; nor did any child of decedent's brothers and sisters survive Bayard Long. But 14 grandchildren of decedent's brother and sisters did survive Bayard Long and accountant suggests that the balance of residue is to be distributed in equal shares among these 14 grandchildren.

Of the 14 living grandchildren of decedent's brother and sisters, each sister is survived by six grandchildren and decedent's brother is survived by two grandchildren. It is the position of the two grandchildren of decedent's brother that upon decedent's death, their grandfather had a vested interest in one-third of decedent's estate, so that they are now to receive this vested interest, each being entitled to one-sixth, rather than one-fourteenth, of decedent's estate.

Decedent's intent must be gathered from a consideration of all of the language contained in the four corners of his will, and not merely from isolated clauses or provisions thereof: Dinkey's Estate, 403 Pa. 179. The court is convinced from a careful consideration of the entire will that decedent intended the class for distribution to be determined as of the death of Bayard Long. This intention of decedent is particularly made clear in the following language:

. ". . . and at his death to distribute the principal of my estate, to my brothers and sisters and the descendants of those who shall have died, according to the intestate laws of the State of Pennsylvania."

The court is satisfied that decedent intended the class for distribution to be his brothers and sisters and the descendants of those who *shall have died* as of the time of Bayard Long's death. And decedent intended

the intestate laws of the State of Pennsylvania, as they existed at his death, to govern both as to persons and as to shares. Cf. Dinkey's Estate, supra, Derham Estate, 435 Pa. 590. Accordingly, the balance of residue is to be distributed in equal shares among the 14 grandchildren of decedent's brother and sisters.

And now, February 21, 1973, this adjudication is confirmed nisi.

---

*Anthony L. Differ*, of *Fox, Differ, Mazer & Callahan Townsend, Elliott & Munson; Frederick Clark* and *Norman H. Brown*, of *Ballard, Spahr, Andrews & Ingersoll*, for accountant.

*James J. Martin*, for objectors.

*Samuel S. Logan, Jr.*, of *Montgomery, McCracken, Walker & Rhoads*, for remaindermen.

## OPINION SUR EXCEPTIONS

TAXIS, P. J., June 8, 1973.—This matter is now before the court upon exceptions to this court's adjudication dated February 21, 1973, of the first and final account of Provident National Bank, trustee.

Exceptions were filed on behalf of descendants of decedent's sisters, whose objections seeking to have accountant surcharged for losses sustained in the sale of shares of accountant's own stock were dismissed by the court's adjudication. In support of these exceptions, exceptors' counsel has contended that the court failed to consider as a critical fact that the "primary reason" for retention of the Provident stock was that it was likely to increase in value. The testimony of accountant's witness upon which counsel relies is as follows:

"But I think the primary—none of these reasons that I have mentioned would be conclusive if at that time

the bank had not—the officers had not considered that the stock was a sound investment and that the price was a reasonable price, and that there were prospects for an improving situation in the years ahead.

"Q. You indicated that there were several reasons why the trust department decided to retain the Provident Trust stock. I think you gave four, but the main reason you indicated was that the trust department considered this to be a sound investment; is that correct?

"A. Yes. I made that—I may have said the main reason, on the ground that if that had not been true, the other reasons would not have validity."

From these statements the court concluded that accountant would not have considered even a temporary retention of this stock, not even for reasons which accountant deemed valid, if the stock had not been considered a sound investment. The testimony of accountant's witness did not indicate to the court that accountant retained the stock by way of speculation, and in order to receive a better price than the securities were reasonably worth; rather, the stock was considered to be a sound investment which, in the judgment of accountant, should not be sold at a sacrifice, but retained until it could be sold at its true value. Cf. Casani's Estate, 342 Pa. 468, 478.

The exceptions seeking a surcharge of accountant have been sufficiently and fully considered in the court's adjudication and need not be repeated here. These exceptions are dismissed.

Exceptions were also filed on behalf of two grandchildren of decedent's brother, who contend that their grandfather had a vested interest in one-third of decedent's estate, so that they are now to receive the vested interest, each being entitled to one-sixth of decedent's estate rather than the one-fourteenth share awarded

by the court's adjudication to the 14 grandchildren of decedent's brother and sisters.

The court is convinced from a careful consideration of the entire will that decedent intended the class for distribution to be determined as of the death of Bayard Long, and that the intestate laws of Pennsylvania, as they existed at decedent's death, are to govern as to the identity of and the shares of the distributees. The court finds such intention of decedent to have been made particularly clear from the following language: ". . . and *at his death* to distribute the principal of my estate, *to my brothers and sisters and the descendants of those who shall have died,* according to the intestate laws of the State of Pennsylvania." (Italics supplied.)

These exceptors place great emphasis on decedent's omission of words requiring "survival" of Bayard Long as a condition to the gifts in question, contending that since decedent used words of survival with regard to gifts in other parts of his will, he intended the absence of the words in this part of his will to indicate his intention that the gifts be vested.

While the words employed in a will necessarily constitute the gauge of the testator's intent, a construction that would lead to a highly improbable result is to be avoided, if at all possible; and a meaning conformable to the testator's plausible intent should be ascribed to his words if agreeable to reason: Hannach's Estate, 332 Pa. 145.

An analysis of decedent's will clearly demonstrates that decedent used words of survival inartfully, rather than to indicate an intention to create a contingent interest as opposed to a vested interest. For example, decedent initially created an income interest in his estate for his wife and provided that the trustee "at her death . . . pay the . . . income to my son Bayard during his lifetime." No words of survival were expressly used

with regard to Bayard's life interest, but decedent provided later in his will for a life interest for his wife with regard to a house at Spray Beach and then provided for a life interest for his son "if he survive." The words of survival appear to have served no useful purpose and were inartfully used.

In the portion of decedent's will relied upon by exceptors, decedent provided as follows: "Excepting, further that in case my son Bayard should marry and have children, the abovesaid estate, at his death, shall descend to them or their heirs, *if any survive my said son,* instead of going to my brothers and sisters and the descendants of those who may be deceased."

Decedent continued that provision as follows: "J.L.L. the income . . . and one-third of such sum as may be counted as principal of my estate, to any widow my said son may leave, for her life, and then to their descendants."

Under exceptors' analysis of the will, decedent intended by this language that his children or their heirs would have to survive their father to receive the gift after his death, but would not have to survive their mother to receive the gift after her death. In the language of Hannach's Estate, such a highly improbable result is to be avoided, if at all possible.

The court, of course, recognizes that gifts to Bayard Long's children or his widow are not in question. But an analysis of the language of these gifts, a portion of which has been relied upon by exceptors to support their position, indicates that the language of survival used by decedent in his will was inartfully used and does not warrant the emphasis which exceptors have attributed to that language.

One further improbable result to which exceptors' interpretation of the will would lead is that the Estate of William H. Long, who died in 1949, would appear

to be entitled to one-fourth of the balance of principal and income for it is exceptors' position that the interests of the brothers and sisters are vested subject to being divested in two instances: (1) If Bayard should marry and have children; or (2) if any of the brothers and sisters should die *leaving descendants.*

The court is convinced of decedent's intention which clearly indicates that decedent intended the class for distribution to be his brothers and sisters and the descendants of those who shall have died as of the time of Bayard Long's death and that decedent intended the intestate laws of Pennsylvania, as they existed at his death, to govern both as to persons and as to shares. Accordingly, the exceptions filed on behalf of the two grandchildren of decedent's brother are dismissed.

## FINAL DECREE

And now, June 8, 1973, all exceptions filed to the adjudication of this court dated February 21, 1973, are herewith dismissed. Said adjudication, as supplemented by this opinion, now becomes the final adjudication of this court as of June 8, 1973.