William N. Cross died January 10th, 1929, leaving a last will and testament in which he gave his estate to his executors, his brother, Edwin S. Cross, and the Westfield Trust Company, in trust, to pay the income, and as much of the principal as may be necessary, for the support of his widow and two minor children, until the youngest child arrived at the age of twenty-five, and until the death of the widow, and then the principal to the children.
The estate was appraised, February 13th, 1929, at $40,000, of which $39,000 consisted of shares in six public utilities; electric light and power companies. At the testator's death, the market value of the shares was $46,000; when the executors filed their account, three years and eight months later, it was $9,000. The market value of $46,000 gradually rose until it reached the peak, $71,000 just before the crash, in the fall of 1929; in the crash it slumped to $33,000, after which it went to $62,000 in April, 1930; and from then on, month after month, for two years, with a single interruption, there was a gradual decline until it reached the low point of *Page 612 
$3,000 in June, 1932. When the account was filed it had risen to $9,000. These are round figures, in thousands only.
Exceptions were filed to the account by the widow, charging the executors with mismanagement and responsibility for the loss. The orphans court, apparently without calling upon the executors to acquit themselves, overruled them and allowed the account. The infants were not represented. Their guardian, afterwards appointed, appeals from the decree allowing the account.
The appalling loss calls for an explanation. Beam v.Paterson Safe Deposit and Trust Co., 81 N.J. Eq. 195. The brother-executor has given none; his only explanation could be that he gambled and lost. The trust company's only explanation is that it deferred to the judgment of its co-executor and submitted to his refusal to sell.
The stocks were of the high grade speculative type of the boom days, and trading in them on the stock exchange was active. The testator evidently had confidence in his brother's judgment when to sell, for in his will he provided: "I direct my said trustees to sell whatever securities may be necessary to pay any necessary expenses, but only such securities shall be sold as my said brother, Edwin S. Cross, if he then be alive, shall designate." The brother's avowed ambition was to translate the $39,000 investment into a $100,000 estate, and as market quotations were in the upward swing when the executors assumed office, they let the stocks float along on the incoming tide of "prosperity" until the crash, nine months later, to them but a passing setback, and when quotations again began to soar, they stayed to the peak, and when the decline set in in May, 1930, they supinely ignored it and the constantly sinking prices, for nearly two years following, failed to move them to salvage even a part of the estate.
The appellant's grievance lies in the failure of the executors to sell the stocks when they recovered their appraised value after the crash, and retaining them after they started on their steady downward course. They lay no claim to the sky-rocket profits, nor measure their damage by the plummetlike loss in the 1929 debacle; nor do they seek the profits *Page 613 
after the recovery, later lost, but they point to the precipitous drop of the "Black Friday" as an alarming spectacle, an admonition, and to the gradual descent, after the recovery, as the rumble of approaching disaster, a beckon to step aside. Had prices continued to drop after the crash, even to their present deplorable state, and had the executors held on in the hope of recouping their losses, their conduct might have been reconcilable with careful management. Trustees are not responsible for honestly adoping the wrong course in an emergency. No one quarrels with this as a general proposition of law; it was reiterated only recently by Vice-Chancellor Lewis inIn re Pettigrew, 115 N.J. Eq. 401, holding that a trustee, acting carefully, though erroneously in a falling market is not accountable. And in Beam v. Paterson Safe Deposit and TrustCo., 83 N.J. Eq. 628, the court of errors and appeals absolved the trustee of the charge of failure to exercise a reasonable discretion in a falling market, because, as it said, "nothing occurred to disturb anyone's sense of security until about September, 1907, when receivers were appointed," nor until the receiver stopped paying dividends, and, "as long as the dividends and interest were regularly paid under an order of the court, the trustees were certainly justified in disregarding the market fluctuations, unless there was something else to arouse their suspicions," and "when the default in dividends and interest came later, the time had passed when it was possible to save the situation." The bottom had completely dropped out of the market. But here the executors, after they recouped their loss, plunged deeper into the maelstrom to make profit, indifferent to the obvious, that they were playing in treacherous waters, in a whirlpool fraught with danger, for they knew the prices did not represent real values, that they were manipulated, inflated; the meager annual returns of less than two per cent. on the quoted prices alone told them that, and though for a year thereafter they could have withdrawn with the investment intact, they, with their eyes on the ticker instead of the trust, played the entire estate against Wall Street, ignoring the lesson of the terrific shock and five months of daily warning of the gradual and *Page 614 
protracted decline, in a willful and stupid determination to risk what was then safe, in the weird pursuit of an elusive $100,000 prize. That the times were abnormal and others were taking the same risks is not an answer for a trustee, as it may be an excuse for one speculating with his own money. A trustee's duty of care, ever increasing to meet rising dangers, is not to be measured by that standard. And it is not a strained assumption that, as prudent, discreet persons, the trustees would not have staked their own all on the turn of the wheel of fortune, as they did that of their helpless and now impoverished wards.
The argument that when prices began to sag in May, 1930, the trustees found themselves in a quandary, whether to sell or hold on, and that they used their best judgment in the emergency, is feeble. They were in the safety zone for five months before the true emergency arose; they had an abundance of time in which to save the investment, and besides they cannot claim immunity for error in an emergency which they challenged and defied. Acting prudently in a dilemma they courted, in an emergency they invited, is not a legal explanation absolving them from responsibility for the loss of the estate.
The brother-executor's duty to sell when reasonable care demanded, was none the less because the stocks were not to be sold without his consent. While we cannot condone his riding along with the hurrah of the day in that period of financial aberration, when bucking the market, taking a chance, looking for easy money was common pastime, we cannot reconcile his venturesome spirit after the crash, when danger was lurking, with reasonable care and discretion. The testator's faith in him was not a cue nor license to speculate. The stock market is not a playground for trustees. The ethics of trusteeship is not to be found in the code of the speculator. An executor's function is to conserve, not to venture. It is no less a breach of trust to speculate with securities of an estate than to gamble with its money, though the motive be to advance its interests.
The trust company fully realized the stocks were not proper *Page 615 
investments for the estate, and felt that they should be sold as soon as possible, so its president now admits, but did nothing except to counsel the co-executor to sell, accepting his refusal without protest, and his forecast that they would go to $100,000, complacently. The last time the president suggested that they be sold, was when prices started downward, in May, 1930, when, as he says, they could have been disposed of for $58,000, and thereafter, all during the long period of their mournful descent, the trust company remained quiescent, an onlooker of the passing tragedy, content that the coexecutor's hey-day resolution not to sell relieved it of responsibility.
Neither executor can take refuge in the statute, which permits executors, in the exercise of good faith and reasonablediscretion, to continue investments made by testators. Comp.Stat. p. 2271. The statute does not protect when ordinary circumspection dictates that the investments be disposed of to safeguard the estate.
The trust company must share the responsibility with its co-executor. The direction of the testator, that the stock was not to be sold without the consent of his brother, ceased to be a shield when the estate became endangered by his conduct. Holding itself out as a specialist in trust affairs it should be held to a high decree of care. In re Chamberlain, 9 N.J. Mis. R. 809.
It was no doubt appointed co-executor because of its reputed qualifications. Its duty was plain, to bring the matter into court for instructions. It had nearly a year to act, in which it could have prevented the catastrophe. The court had the power to order a sale, notwithstanding the provisions of the will that the brother consent, and would have exercised it upon a showing of abuse of the discretion. Holcomb v. Holcomb, 11 N.J. Eq. 281;Smith v. Pettigrew, 34 N.J. Eq. 216; Hill v. Hill, 79 N.J. Eq. 521.
As the stocks could have been sold as late as September, 1930, without diminution of the estate, the damage will be fixed as of that time, not to exceed the inventory appraisement, viz.: The trustees will be held liable for the amount of the inventory appraisal, less the value of the stock at which *Page 616 
it may be presently sold; or for the full amount of the appraisement, if the executors care to take the stock.
Some few shares of stock were sold by the executors at a loss. The loss will have to be taken into the reckoning. Counsel will make the calculation.
The estate was indebted to the trust company on a note for $3,000 and an additional sum of $500 borrowed by the executors and upon this indebtedness the executors have been paying interest. They should have promptly sold enough stock to pay the debt. They will be charged with the interest paid from one year after the death of the testator, less the yield on the shares that would have been required to be sold to pay the debt. *Page 617