JOSEPH A. BRODERICK, as Superintendent of Banks of the State of New York, Plaintiff, *v.* BERNARD K. MARCUS and Others, Defendants.

Supreme Court, New York County, June 11, 1934.

 

*Carl J. Austrian* [*Arthur Ofner, Leo C. Fennelly, I. B. Oseas* and *S. Boksenbom* of counsel], for the plaintiff.

*Irving D. Lipkowitz,* for the defendant William Fischman.

*A. Bertram Samuels* [*Morris G. Duchin* of counsel], for the defendant John F. Gilchrist.

*William Klein* [*Milton R. Weinberger* of counsel], for the defendant Harry H. Revman.

*Stein & Salant* [*Eli S. Wolbarst* of counsel], for the defendant Reuben Sadowsky.

*Tolins & Jakobson* [*Joseph P. Tolins* of counsel], for the defendant Morris Weinberg.

*Myers, Goldsmith, Behr & Michael* [*Norman Behr* of counsel], for the defendant Morris White.

*George C. Van Tuyl, Jr.,* in *pro. per.*

*Francis S. Levien,* for the defendants Bernard K. Marcus and another.

VALENTE, J. This action is brought by the Superintendent of Banks against the former directors of the Bank of United States to recover losses sustained by the bank as a result of alleged violation by the defendants of their duties as directors. The Superintendent is now in possession of the property of the bank and is bringing the action under the authority vested in him by section 81 of the Banking Law.

At the time of the institution of the action, there were about forty defendants, of whom the majority settled for amounts varying in accordance with their financial ability to pay. These settlements received the approval of the court, and further reference to them will be made hereafter.

The chief losses were the result of unsecured loans made to an affiliate of the bank known as Bankus Corporation. The latter was organized in November, 1928, and its directors and officers occupied similar positions in the bank. After the organization of that corporation, the stock of Bank of United States was interlocked with that of Bankus, so that the stock of these corporations could only be purchased in units; each consisting of one share of stock of Bank

of United States and one share of Bankus. Corporation. The function of Bankus seemed to be principally to buy and sell shares of Bank of United States units. At the very time of the organization of Bankus several million dollars were loaned to it by the bank in order to purchase such stock. In addition, two other subsidiaries known as City Financial Corporation and Municipal Financial Corporation also received large loans. The two were owned by Bankus to the extent of ninety-nine per cent of their outstanding shares. These corporations also owned a large number of subsidiaries, which were engaged principally in building development. They had only a nominal capital, and the loans to them were unsecured. The several loans mentioned on which the bank suffered large losses were virtually all unsecured.

The ultimate result of the transactions with Bankus was a net loss on the loan to that corporation between May 22, 1929, and November 22, 1930, of $4,750,000. If to these losses were added those arising by reason of loans to City Financial and Municipal Financial corporations, the aggregate loss reaches a total of nearly $12,000,000. In addition to these sums, the bank suffered considerable losses, though not of the same staggering proportions, by reason of unsecured loans to other minor companies all of which were subsidiaries, directly or indirectly, of Bankus Corporation. The aggregate capital and surplus of the bank was never higher than $47,000,000, but the unsecured loans to Bankus and affiliates were in excess of twenty-five per cent of the capital and surplus

Counsel for the plaintiff, with indefatigable industry, has fully developed the details regarding the various alleged improvident loans, and has presented them with commendable clearness and in systematic arrangement. The amount of the loans and the fact of the losses is beyond question. The only thing to be considered is whether these losses are to be chargeable against the defendants. The action against the directors involves their accountability from a double aspect: *First*, that the loans were improvident in that they were made upon no security to corporations without substantial assets; and, *second*, and more important, that in making the loans which have resulted in the losses referred to the directors violated the banking laws, and the consequences of such violation are the losses of millions of dollars to the bank and its creditors.

Banking Law, section 108, subdivisions 1 and 7, for the violation of both of which it is sought to hold the directors liable, reads as follows:

" A bank subject to the provisions of this article

" 1. Shall not directly or indirectly lend to any individual, partnership, unincorporated association, corporation, or body politic, an amount which, including therein any extension of credit to such

individual, partnership, unincorporated association, corporation or body politic, by means of letters of credit or by acceptance of drafts for, or the discount or purchase of the notes, bills of exchange or other obligations of, such individual, partnership, unincorporated association, corporation or body politic, will exceed one-tenth part of the capital stock and surplus of such bank: * * *

"(d) In computing the total liabilities of any individual to a bank there shall be included all liabilities to the bank of any partnership or unincorporated association of which he is a member, and any loans made for his benefit or for the benefit of such partnership or association; of any partnership or incorporated association to a bank there shall be included all liabilities of its individual members and all loans made for the benefit of such partnership or unincorporated association or any member thereof; and of any corporation to a bank there shall be included all loans made for the benefit of the corporation. * * *

" 7. Shall not knowingly lend, directly or indirectly, any money or property for the purpose of enabling any person to pay for or hold shares of its stock, unless the loan is made upon security having an ascertained or market value of at least fifteen per centum more than the amount of the loan. Any bank violating the provisions of this subdivision shall forfeit to the people of the state twice the amount of the loan."

Section 124 of the Banking Law provides that " Each director, when appointed or elected, shall take an oath that he will, so far as the duty devolves on him, diligently and honestly administer the affairs of the bank, and will not knowingly violate, or willingly permit to be violated, any of the provisions of law applicable to such bank."

It is not necessary to assume that those responsible for making the improvident loans acted from corrupt motives or with a purpose of making individual gain. The general inference to be drawn from the set up of the Bankus Corporation is rather the opposite. The directors, by means of stock speculation through the instrumentality of the Bankus Corporation, using funds furnished by the Bank of United States, expected to make large profits for the stockholders of Bankus and for those of the bank. The gross impropriety of such a practice of jeopardizing, by highly speculative transactions, the funds intrusted to the bank by depositors, is self-evident. The irony of it is that the very stockholders whom it was intended to benefit have lost their entire investment and have been subjected to liability as well. Upon whom shall responsibility for the losses resulting from such breach of trust be visited? Obviously, the officers and the members of the executive committee who were the prime agents

in the dissipation of the funds in the manner described are responsible in the first instance. To what extent is this responsibility to be shared by the other directors?

The statutory oath which a director of a financial institution is required to take binds him diligently and honestly to administer the affairs of the bank. The commands and the prohibitions contained in section 108 of the Banking Law are mandates to the directors.

As is said in *People* v. *Knapp* (206 N. Y. 373, 381): "A command addressed to a corporation would be idle and vain unless the legislature in directing the corporate body, acting wholly by its directors, to do a thing required or not to do a thing prohibited, meant that the directors should not make or cause the corporation to do what was forbidden, or omit to do what was directed."

Consequently, the violations of section 108 in which directors knowingly participate makes them severally accountable for damages which such participation occasions. But, further, a failure by a director to inquire what those actively administering its affairs are doing may in itself be a violation of the director's duty and of his statutory oath. Thus, in *Martin* v. *Webb* (110 U. S. 7, 15; 3 S. Ct. 428, 433; 28 L. Ed. 49) it was said: " Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers. They have something more to do than, from time to time, to elect the officers of the bank, and to make declarations of dividends."

And in *Briggs* v. *Spaulding* (141 U. S. 132, 165; 11 S. Ct. 924; 35 L. Ed. 662) it is said that their duties are more than officiating as figureheads. While they are entitled under the law to commit the banking business to the duly authorized officers, it does not absolve them from the duty of reasonable supervision, nor ought they to be permitted to be shielded from liability because of want of knowledge of wrongdoing, if that ignorance is a result of gross inattention.

The decisions of the United States Supreme Court, based upon the National Banking Act and the duty of directors of national banks, are fully applicable in the State courts. In *Kavanaugh* v. *Commonwealth Trust Co.* (223 N. Y. 103, 106) the duty of directors is thus stated: " They should know of and give direction to the general affairs of the institution and its business policy, and have a general knowledge of the manner in which the business is conducted, the character of the investments and the employment of the resources. No custom or practice can make a directorship

a mere position of honor void of responsibility, or cause a name to become a substitute for care and attention. The personnel of a directorate may give confidence and attract custom; it must also afford protection."

The reason for the higher standard of diligence required of banking directors as compared with that of other corporations is obvious. While legalistically the relation between the bank and its depositors is that of debtor and creditor, practically the directors are charged with the trust responsibility to see that depositors' funds are safely and providently invested. The bulk of the funds of a bank are usually spread out in the form of loans to the business community to help the wheels of industry revolve, and the main responsibility of the director is for the safe and legal application of the bank funds in the form of loans and investments. It is not for him to wait until the facts are thrust in his face. He must at all times take the initiative in examining the loan portfolios. It is no defense, therefore, as one or two of the directors have attempted to assert, that certain loans were not called to their attention or that they were absent at a certain meeting when a particular loan was approved. A sufficient period elapsed since the making of the loan to enable them to inquire into its propriety, and, since they took no steps in protest, they must be deemed to have ratified it. In the *Kavanaugh* case the defendant director even appeared never to have gone near the bank, to have known nothing of its affairs, and to have given no attention to its business; yet the court held that, if the proof showed that his neglect contributed to the losses, he was liable.

The disregard of all sound banking principles in the making of the speculative, unsecured and improvident loans resulted in huge losses, for which not only those who actively directed the making of such loans are responsible, but also those who as directors supinely acquiesced in them or failed to inquire into the character of the loans. Every vestige of possible defense based upon an honest mistake of judgment is destroyed by the fact that the loans which resulted in the losses were made in violation of the banking laws. These infractions of the law may also be said to be the direct and proximate cause of the losses. Surely, if the directors illegally made loans in excess of ten per cent of the capital and surplus, the loss of that excess must be chargeable to the directors, for, if they had not loaned the money in violation of the law, there would have been no opportunity for the loss. Again, losses on loans which were made without security for the purpose of enabling the borrower to pay for or hold shares of the stock of the bank must also be chargeable to the directors, for, if they had not made the illegal loan, the loss would not have occurred.

I have indicated in the findings various amounts for which the directors are severally liable, after giving effect to a credit resulting from settlements with some of the directors. Some remarks on the settlements are appropriate here, because one of the defending directors has argued that his liability should be no greater than the largest amount secured from any director by way of settlement. I can see no basis for such a bizarre proposition. Settlements were made with directors upon the basis of their ability to pay, and only after a searching examination into their affairs. It seemed wiser in the liquidation to secure some practical benefits for the creditors than to give them the doubtful benefit of fantastic judgments against directors, which might be wiped out by proceedings under the Bankruptcy Law (U. S. Code, tit. 11). The amount secured in settlements either by present payment or by assured promise of payment is $1,600,000. The entry of judgment against those directors who have not settled does not necessarily foreclose them from any efforts to obtain an adjustment, although it may make their road harder. I have also considered the separate defenses of defendant Sadowsky, especially the defense of the three-year Statute of Limitations, and find them without merit.

All findings are herewith passed upon and decision signed. Submit judgment.