**MARCUS v. OTIS et al.**

No. 257, Docket 20969.

Circuit Court of Appeals, Second Circuit.

May 20, 1948.

650

Ewing, of New York City, of counsel), for Automatic Products Corporation.

Before L. HAND, AUGUSTUS N. HAND and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The case comes up upon appeals by the defendants from a judgment holding them liable, as directors of the Automatic Products Corporation, a Delaware corporation, for the conversion of 116,500 shares of stock in another corporation, Majestic Radio & Television Corporation, which the Automatic Products Corporation had bought from a third corporation—Allen B. DuMont Laboratories, Inc.[1] The judge held the defendants also as "constructive trustees," because, being directors of "Automatic," they had withdrawn its funds to buy the shares in controversy; and he held that the measure of liability was the same on either basis. The chief questions are whether the defendants did convert the shares; and, if so, how many? Whether they are liable as "constructive trustees"? What is the measure of the recovery in case they are liable for either reason? The same action was before us two years ago upon an appeal from a judgment approving a settlement, as required by the Rules.[2] We reversed that judgment and remanded the cause for trial,[3] and it has now been tried on the merits. The most important issue is how a transaction is to be interpreted, which occurred on April 26, 1943, and by which "DuMont," for a payment of $137,000, transferred to the defendants all the securities in "Majestic" which it held. The plaintiffs are not shareholders of "Automatic," but of British Type Investors, Inc., a holding company which owns a controlling interest in a second company —Allied International Investing Corporation—and the Allied International Investing Corporation in turn owns a controlling interest in "Automatic." We shall, however, decide the case as though the plaintiffs were direct shareholders of "Automatic," disregarding the two holding companies. Although "Automatic" itself was

Kenneth M. Spence and Spence, Hotchkiss, Parker & Duryee, all of New York City (Julius J. Teller, of New York City, and Thomas L. Howe, of White Plains, of counsel), for appellants Otis, Franklin, Hutchinson and Harrison.

Robert P. Patterson and Charles L. Sylvester, both of New York City (Sidney G. Kingsley, of New York City, and Ambrose L. Cram, of Roslyn Estates, of counsel), for appellants Eugene A. Tracey and Marie L. Tracey.

Kent H. Meyers, of Cleveland, Ohio, and Robert E. Connolley, of New York City, for appellant Kuth.

Abraham Marcus, pro se.

Samuel Marion, of New York City, for appellees, Miller and Smigel.

Clifton P. Williamson and Alexander & Green, all of New York City (James D.

---

[1] It will be convenient to speak of the first corporation as "Automatic"; of the second, as "Majestic"; of the third, as "DuMont."

[2] Federal Rules of Civil Procedure, rule 23(c), 28 U.S.C.A. following section 723c.

[3] Upson v. Otis, 2 Cir., 155 F.2d 606.

not a manufacturing company, it was more than a passive holding company, for it advanced money in aid of their business to manufacturing companies, among which was "Majestic." "Majestic" had been unsuccessful; it had been through a second reorganization in 1940, it had not declared a dividend since that time, and it had needed substantial financial assistance, which "Automatic" had given it. It had issued a small number of preferred shares, a few debentures, and 786,375 common shares, of which before December 2, 1942, "Automatic" had acquired 325,570, and Allied International Investing Corporation, 147,771; so that together their holdings came to nearly two-thirds of the total issue. The defendant, Tracey, had had experience in making radios, which was "Majestic's" business; and he had become its president at the solicitation of "Automatic" and "DuMont," for "DuMont" itself owned 91,414 common shares in "Majestic," about 600 preferred shares, and $22,472 of debentures; and it had also an option on 100,000 unissued shares at $1.00. As an inducement to Tracey to become president ("Majestic" not being in a position to pay him a large salary) "DuMont" had given him an option on 40,000 of its shares: 20,000 at $2.00, and 20,000 at $2.50, which expired respectively on May 1, 1945 and May 1, 1946.

So much is conceded; what follows is the substance of the testimony at the trial, all of which with unimportant exceptions came from the defendants themselves, or from one, Raibourn, "DuMont's" treasurer. Tracey, who had already become a director of "Automatic" on December 2, 1942, reported to a meeting of its board on that day that "DuMont" was looking for a chance to be rid of all its holdings in "Majestic"; and he suggested that it might be willing to sell at cost—$24,000. The board directed its officers to look into the matter; and soon afterwards Franklin, "Automatic's" treasurer, chanced upon "DuMont's" president, Allen B. DuMont. That gentleman very positively rejected the suggestion of a sale at cost; and at a meeting of "Automatic's" directors on January 26, 1943, Franklin so reported and at his recommendation the board dropped the project. However, "DuMont's" officers had apparently not abandoned their desire to get rid of its interests in "Majestic," and, about the first of April, Raibourn opened negotiations with Tracey and Franklin. Raibourn did not know that Tracey had become a director of "Automatic," but supposed that he had to include him in any sale because of Tracey's option upon 40,000 shares. Raibourn told Tracey that he had sounded out one of Tracey's partners in an engineering firm, who told him that the firm was unable to "finance" the purchase; and for that reason he told Tracey that he would try to learn from Franklin whether "Automatic" would do so. Raibourn offered to sell at $200,000, and he later telephoned Franklin, suggesting that "Automatic" should "finance" the sale. Tracey at once told Franklin of his talk with Raibourn, and Franklin answered that he did not think it wise for "Automatic" to buy the securities, but that it might be worthwhile for it to "finance" the purchase for a proper return; and that he might himself take 10,000 shares. Later Tracey and Raibourn had several telephone talks, and on April 16th, they agreed upon a price of $137,000, Tracey saying that he thought "Automatic" would furnish the money at the end of the ten days within which the sale was to be closed. Tracey told Franklin of this agreement, and concededly Franklin on that day telegraphed Raibourn as follows: "Confirm purchase from you of DuMont's entire investment in Majestic Radio for $137,000. * * * Please wire your acknowledgment. Curtis Franklin, Treasurer, Automatic Products Corporation." Raibourn called up Tracey that day, and asked why Franklin had signed as treasurer of "Automatic," and Tracey answered that Franklin and Otis, "Automatic's" president, wished "Automatic" to "finance" the sale. Thereupon Raibourn still on the 16th telegraphed in reply: "This will confirm purchase by you of DuMont's entire investment in Majestic Radio as outlined your wire."

All of "Automatic's" directors, except the defendant, Kuth, met in Chicago on the 20th; but not only was there no evidence that anyone except Franklin and Tracey

had learned of the exchange of telegrams, but Franklin affirmatively swore that he did not mention them at the meeting. However, Tracey did tell the board of the offer, and said that, although he might be able to "finance" the sale through a bank, he preferred to have "Automatic" advance the money for a period of six months, in consideration of an allocation of 15,000 shares to it at a nominal price, or at six per cent interest. He then left the meeting, and the others discussed the proposal, and then passed the resolution, recorded in the minutes, of which a copy appears in the margin.[4] That evening, Franklin, from Chicago called up Kuth in Cleveland, and

[4] "The Chairman stated that the Corporation had been given the opportunity to acquire, as part of a group, the entire investment of Allen B. DuMont Laboratories, Inc. in Majestic Radio & Television Corporation consisting of 91,414 shares of common stock, 598 shares of preferred stock which are convertible into 1,495 shares of common stock, an assignable option to purchase at $1.00 per share all or any part of 100,000 shares of Common stock at any time or from time to time on or before June 25, 1944 and $22,474.20 principal amount of Ten-Year 5% sinking fund debentures for a cash payment of $137,000 and involving a further payment of $100,000 upon exercise of the option and that these debentures and shares had been subscribed for by the undermentioned persons for payment on or before November 30, 1943, except as to the debentures which have been paid for in full.

### Shares to be Acquired

| | |
|---|---|
| Common Shares | 91,414 |
| Common Shares upon conversion of Preferred | 1,495 |
| Common Shares upon exercise of option | 100,000 |
| Total | 192,909 |

*(Continued)*

### Subscriptions for Shares

| | Price per Share | Shares | Dollar Amount |
|---|---|---|---|
| Mrs. Cora Casagrande | $1.20 | 10,000 | $ 12,000.00 |
| Mrs. Florence Freese | do | 1,000 | 1,200.00 |
| Dudley E. Foster | do | 1,000 | 1,200.00 |
| Hugh H. Gilmour | do | 500 | 600.00 |
| Joseph J. Neri | do | 500 | 600.00 |
| Edward F. Barile | do | 500 | 600.00 |
| Harry T. Byrne | do | 250 | 300.00 |
| Robert M. Hall | do | 250 | 300.00 |
| Mrs. Marie L. Tracey | do | 71,500 | 85,800.00 |
| Curtis Franklin | do | 10,000 | 12,000.00 |
| Edward V. Otis | do | 10,000 | 12,000.00 |
| William R. Harrison | do | 5,000 | 6,000.00 |
| William Hutchinson | do | 3,000 | 3,600.00 |
| Byron D. Kuth | do | 3,000 | 3,600.00 |
| British Type Investors, Inc. | do | 11,771 } | |
| do | 1.50 | 26,409 } | 53,738.70 |
| Scottish Type Investors, Inc. | 1.20 | 3,000 | 3,600.00 |
| Allied International Investing Corporation | do | 2,229 | 2,674.80 |
| Empire American Securities Corporation | do | 8,000 | 9,600.00 |
| Automatic Products Corporation | 57¢ | 25,000 | 14,101.98 |
| Total | | 192,909 | $223,515.48 |
| $22,474.20 of Debentures purchased by Majestic Radio & Television Corporation for | | | 13,484.52 |
| Total | | | $237,000.00 |

"The stock acquired by this Corporation from the DuMont interests is subject to an option to E. A. Tracey to purchase 20,000 shares at $2.00 per share and 20,000 shares at $2.50 per share at any time or from time to time on or before May 1, 1945 as to 20,000 shares and on or before May 1, 1946 as to 20,000 shares, and Mr. Tracey has agreed to waive his rights to the three-fourths or 30,000 of the 40,000 shares under option. After full discussion, upon motion duly made and seconded, the above proposal was unanimously approved."

told him what had taken place; Kuth agreed to what had been done, and said he would personally take 3,000 shares; and Franklin mailed to him a copy of the minutes. Before the closing date on the 26th each of the directors signed a note to "Automatic" for the price of his shares at $1.20, and executed a power of attorney by which his certificates, when issued, would become security for what he borrowed. On the 26th, Franklin delivered a cheque of "Automatic" to "DuMont" for $137,000; Tracey released "DuMont" from his option; and "DuMont" delivered the "Majestic" securities, including its option on 100,000 shares at $1.00 a share. On the next day new certificates were issued; but, since "DuMont" then held only 94,414 shares, it was necessary, before all the required shares could be distributed, for "Automatic" to take up the option on 100,000, transferred by "DuMont." "Automatic" did take up that option on May 10th, and the certificates were thereupon issued and distributed as provided in the minutes. All the "subscribers" paid their notes before November 30, 1943, except Mrs. Tracey, and she paid hers in March, 1944. Thus all the money taken from "Automatic's" treasury was returned, and "Automatic" had received 25,000 shares of "Majestic" at 57 cents. The defendants sold all but a few of their shares either in the autumn of 1943 or in the spring of 1944; and all sold at a profit above the buying price. "Automatic" never sold any of the shares which it held, except those—130,000—necessary to answer certain options which Tracey had acquired earlier than any of the transactions here in question. Thereafter the value of the stock varied greatly; up to the time of trial its highest quotation was $7.87½ in February, 1945. In the month following the election of a new and independent board of directors of "Automatic," the price ranged between $2.00 and $3.00—not far from that at which the directors had sold. The judge made no findings regarding the testimony of which we have just stated the substance, apparently because he thought any oral agreements made between "Automatic" and "Du-

Mont" had been merged in the telegrams of the 16th, the resolution of the 20th and perhaps in a letter of "DuMont" delivered on the 26th, although he did not mention the last. At any rate, confining himself to the writings, he said in his opinion, "that this Majestic stock was purchased by Automatic and who in turn sold to the parties named in the minutes of April 20, 1943, that therefore it was Automatic who purchased the stock and then advanced funds to these individual directors and other defendants paying Automatic for their shares"; and his findings were in accord with this interpretation.

 Plainly the defendants violated their duty as directors, when they converted the company's funds to buy their shares, and, like any other fiduciaries, they made themselves liable for all profits. That is so fundamental a doctrine as to fiduciaries of all sorts,[5] that it is somewhat surprising to find it questioned. We do not hold them for stepping in ahead of the company, and seizing for themselves a promising bargain available to them only because they were directors, for we accept the judge's finding that the purchase of the "Majestic" shares was not a "business opportunity" which the defendants should have allowed "Automatic" to take for itself. The wrong is much simpler and more fundamental— the misappropriation of funds—and it is neither an excuse that they later repaid what they had taken, nor that they allowed "Automatic" to buy 25,000 shares at 57 cents. The bargain was voidable from the outset, no matter how favorable the terms might be, and "Automatic" can follow and reclaim the abstracted funds in any form they may take, however enhanced in value[6] On the other hand we cannot agree that there was any evidence to support the judge's ruling that "Automatic," even for a passing moment, became the owner of the shares in the sense necessary to support a claim for conversion. The exchange of telegrams on the 16th did not give it any interest whatever, even if Franklin had had authority to act for "Automatic." It is true that he signed his name as treasurer of "Automatic," but Raibourn accept-

---

[5] Restatement of Trusts, § 202 Comment a.

[6] Restatement of Restitution § 202.

ed the offer in New York and there the contract was made.[7] It is the law of that state that, when nothing further appears to modify it, a written contract signed by an agent, as agent for the principal, is a contract of the agent, and not of the principal.[8] True, this interpretation readily yields to explanation outside the writing, but, as we have seen, all the testimony was that "Automatic" was only to "finance" the directors' purchase, not to buy the shares itself; so that, if we did look outside the telegrams, there would be nothing to justify a finding, if the judge had made it, that "Automatic" was to buy more than 25,000 shares. For this reason the absence of a finding as to the testimony is irrelevant. Besides, such a contract would have been invalid for another reason: Franklin, as treasurer, had no power to bind "Automatic." It is true that he testified, as did Otis, the president, that the directors had given them a joint authority to buy securities, subject to ratification by the board; but, as we have said, it nowhere appears that Otis knew any more about Franklin's dealings with Raibourn than did the other directors, and they could not ratify what they did not know.

It is not important to decide whether "Automatic" ever acquired title to the shares; perhaps it did. "DuMont's" letter of April 26th, which was the "closing day," spoke of a "sale by Allen B. DuMont Laboratories to Automatic Products Corporation"; and we will assume arguendo that that made an out and out sale, and that when Raibourn delivered the securities, title did pass. However, it was a title already subject to whatever had been the agreement between the directors, as evidenced by the minutes; and perhaps, as the judge held, exclusively by these, on the theory that the minutes and the resolution which incorporated them were intended as the authoritative memorial of the contract —though incidentally that is a most doubtful conclusion. We need not say, because, as we shall show presently, the minutes

make it clear that "Automatic" was not to become the owner of more than 25,000 shares, and that if it did have a title in those shares which the defendants took it was a title already burdened by a contract to distribute them among the "subscribers" in accordance with the minutes. If so, although the defendants "converted" "Automatic's" funds, they never converted the shares which those funds bought; for the risk of loss and the chance of gain in those were theirs from the instant that "DuMont" delivered them on April 26th. It is true, however, that this conclusion depends upon the interpretation of the agreement between the directors at the meeting at Chicago on April 20th as the minutes disclose it.

These begin with a recital that "Automatic" "had been given the opportunity to acquire, as part of a group, the entire investment." Then, after reciting what the investment was, they proceed: "these debentures and shares have been subscribed for by the undermentioned persons for payment on or before November 30, 1943," after which follows the list of "subscribers." They conclude with this statement: "The stock acquired by this Corporation * * * is subject to an option to E. A. Tracey * * * and Mr. Tracey has agreed to waive his rights to three-fourths or 30,000 of the 40,000 shares under option." Certainly, until one comes to that sentence, there cannot be the slightest doubt that "Automatic" was to be only one "of a group" of "subscribers," that its portion was to be only 25,000 shares, and that the remaining shares were to be distributed according to the schedule. Upon analysis it is plain also that the concluding sentence did not mean by the words, "the stock acquired by the Corporation," other shares than the 25,000 allotted to "Automatic" as one of the "subscribers." Half Tracey's option was at $2.00 and lasted till May 1, 1945, and the other half was at $2.50 and lasted a year longer; and on April 20, 1943 the market price of the shares had

[7] Restatement of Conflict of Laws § 326(b).

[8] De Witt v. Walton, 9 N.Y. 571; Buffalo Catholic Institute v. Bitter, 87 N.Y. 250; Casco National Bank v. Clark, 139 N.Y. 307, 34 N.E. 908, 36 Am.St.Rep.

705; First National Bank v. Wallis, 84 Hun. 376, 32 N.Y.S. 382; Bush v. Gilmore, 45 App.Div. 89, 61 N.Y.S. 682. The doctrine was recognized though not applied in Bank of Genesee v. Patchin Bank, 19 N.Y. 312, 315.

never gone to $2.00, so that on April 20, 1943, the option had only a prospective value. The sale was to be concluded within ten days, and although it is true that it would be necessary for "Automatic" to exercise the option on 100,000 shares at $1.00 which was part of the securities transferred, that would not delay final execution of the whole transaction for more than a few days; and so it turned out. However, the plaintiffs' argument drawn from the mention of Tracey's option in the minutes involves as a premise that 40,000 shares must be held for at least two years beyond April 20, 1943; and that being true, it would have been impossible to distribute the shares in accordance with the schedule. Thus, the only way in which the plan could be carried out was by construing the words: "The stock acquired by the Corporation," as limited to the 25,000, and indeed that independently appears, as soon as one reads the words which immediately follow, and which explain how it came that Tracey's option had been reduced to 10,000.

▮▮ When the case was before us on the rehearing on the first appeal it is true that we invoked this sentence in answer to the argument drawn from the resolution as a whole. We said: "The explanation * * * would seem to be that * * * the acquisition by Automatic and the resales by it to these defendants occurred simultaneously." (155 F.2d at page 614.) This we said in answer to the argument that the resolution alone was a conclusive contradiction of the complaint which had alleged an "appropriation" of the shares; it was in no sense a decision that the minutes proved that there must have been an "appropriation." Indeed we added, at once after the language quoted, that we had "merely considered whether, on the facts presented to the court below, * * * there was sufficient doubt * * * about the liability and amount of damages to justify its approval order." The

record then before us was utterly barren and insufficient for a disposal of the cause. Upson, the plaintiff, Marcus's testator, had moved for approval, in which he was of course supported by the defendants; only the intervening plaintiffs Miller and Smigel objected; and there was no evidence against approval except Miller's affidavit of vague and general protest. Indeed, there was nothing even in support of the settlement except a few affidavits, and thirty-five pages of colloquy between the lawyers and the judge; matter which we have over and over again refused to consider—as we at that time repeated, and now repeat once more.[9] As the case now comes to us the plaintiffs, who have the burden of proving that there was a moment during which it was understood that "Automatic" was to acquire more than 25,000 shares, did not sustain the burden. Their only possible reliance—the minutes —does not support them; for, if we looked to the testimony (as in the case of the telegrams), it would not have supported a finding in their favor if the judge had made one.

▮▮ The remaining questions are as to the measure of the recovery against the defendants as constructive trustees. That they must pay at least the actual profits which they made upon the sale of the shares goes without saying;[10] but the plaintiffs argue that their liability goes further, and that they are liable for profits based upon the highest price which the shares attained from April 26, 1943 until a reasonable time after "Automatic" came into the control of the new board of directors. Their argument is as follows. Since the law treats such purchases as though the misappropriating directors had bought the shares on behalf of their company, they are chargeable with the same duty as directors to sell at the best price available. While they were in control, the company had no opportunity to make a disinterested decision when to sell, be-

---

[9] In re Syracuse Stutz Co., Inc., 2 Cir., 55 F.2d 914, 917; In re National Public Service Corp., 2 Cir., 68 F.2d 859, 861; In re Adolf Gobel, Inc., 2 Cir., 80 F.2d 849, 853; Syracuse Engineering Co. v. Haight, 2 Cir., 97 F.2d 573, 575; Royal Petroleum Corp. v. Smith, 2 Cir., 127

F.2d 841, 843; Upson v. Otis, 2 Cir., 155 F.2d 606, 614.

[10] Restatement of Trusts § 202(1) Comment a; Loft, Inc., v. Guth, 23 Del. Ch. 138, 2 A.2d 225, affirmed 23 Del.Ch. 255, 5 A.2d 503.

cause they were holding in their own interest. They must prove when under disinterested control the company would have sold, because of the general doctrine that "the wrongdoer shall bear the risk of uncertainty which his own wrong has created."[11] Since they have not shown when the company would have sold, and since that might have been at the highest price within the period we have mentioned, they are chargeable with that price. This argument the plaintiffs made upon the former appeal as to the measure of damages in conversion, and we gave it a tentative approval. Nor was our ruling in conflict with the ordinary measure of damages for the conversion of shares of stock; that is, the highest value of the shares over only a reasonable period after the customer gets notice of the conversion.[12] That situation is different from a conversion by directors who have control over a corporation. If a customer, who does not know that the broker has converted his shares, but supposes that he retains the power of selling them, does not order a sale throughout a given period, it is conclusive evidence that he did not wish to sell at any intermediate price; and he ought not to be allowed to charge the broker on the assumption that he might have; while, if a corporation is under the control of directors who have converted property, it is impossible to say that a disinterested board might have not sold the property at some intermediate price. Conceivably therefore in such a case the ordinary measure of damages will not apply; and at any rate that was what we were discussing on the first appeal, for on that record the wrong then appeared to be a conversion of the shares. The argument does not of course apply to the conversion of funds, because money does not fluctuate in value.

We all agree that the defendants, as "constructive trustees," are not subject to the same measure of damages as though they had converted the shares; and my brothers hold that their liability does not go beyond the actual profits which they have made. They regard "Automatic's"

right to follow the converted funds into the shares as a remedy for the conversion no different because the wrongdoers were also fiduciaries. They think that, although the victim may trace his money into any substitute into which the wrongdoer may have changed it, and reclaim it as though it had remained in specie, the law does not in addition impose upon him, even though he be a fiduciary, any of those duties as to the substitute which he would have been under, had the substitute been part of the trust res. It follows that the liability of the defendants at bar must be limited to their actual profits; and, in the case of those who may not have sold the shares, to a return of these and any dividends received, upon payment of $1.20 a share.

I am personally not in accord with this measure of recovery; and I trust that it is permissible for me to state my reasons. I agree that, when the wrongdoer is not a fiduciary, there is no ground for imposing upon him any duties touching the substituted property; but it seems to me that when he is, he should be subject to those duties towards the substitute which he had accepted towards the res. This would mean that a fiduciary, who misappropriates trust funds and turns them into other property, should be treated as though the substitute had been a part of the res, when he became a fiduciary. It seems to me incongruous with the beneficiary's conceded power to treat the substitute as a part of the res, to relieve the fiduciary of those duties regarding it to which he would have been subject, if it had been so in fact. By hypothesis he has committed the gravest dereliction possible—pro tanto a complete repudiation of the trust he expressly assumed—yet that will excuse him from a duty which would have rested upon him, had the substitute innocently come within his control as trustee. True, so far as I can find, the case has never come up in any court, but I submit that it is a corollary of well settled principles.

Therefore, I would impose upon the defendants the same duties towards the shares that they would have been under,

---

[11] Bigelow v. R. K. O. Radio Pictures, 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652.

[12] In re Salmon, Weed & Co., 2 Cir., 53 F.2d 335, 79 A.L.R. 379.

658

had they found them in "Automatic's" portfolio when they became directors. The record is full of testimony from them themselves that they never thought the shares a proper addition to "Automatic's" existing investments; and, if so, it would have been incumbent upon them to dispose of them as soon as they reasonably could. They need not, and indeed they ought not, have thrown them overboard; they had a reasonable time within which to sell; but they are chargeable with any loss if they failed to do so.[13] I would not accept as the end of that period the dates of the actual sales made by them, because, not only did they sell at different times,· but the dates they chose were not the result of that collective and unbiased judgment to which "Automatic" was entitled. Obviously what is a reasonable time within which to dispose of shares, selling upon a market, varies with the shares to be sold and with the number to be disposed of. Six months was the time fixed in Re Busby's Estate,[14] one year in Paul v. Girard Trust Co.,[15] McInnes v. Whitman,[16] and In re Lewis' Estate;[17] ·and eighteen months was said to be the "maximum" in Re Frame,[18] and to be the generally accepted period. On the other hand two years was allowed in Re Seamans' Estate,[19] and three in Re Westfield Trust Co.,[20] a decision later reversed on other grounds.[21] The proper course would be to send the case to a master to determine within what period the defendants ought to have disposed of 100,000 shares, considering the available market.

What price should be selected from among those which prevailed during the period is another matter. In the only case in which the suggestion has come up that it should be the highest intermediate value,[22] the Seventh Circuit refused to impose so severe a standard, following Professor Scott who says that that "would seem * * * clearly not chargeable." Whether or not that is always true, at least it was true in the particular circumstances at bar; for plainly over 100,000 shares could not have been sold at the highest price which obtained on any day within any putative period. Presumably the most profitable way to dispose of so many shares would have been to feed them upon the market gradually, and the best approximation to what would have been so realized, would be to take the average over the whole period. That was the rule adopted in Babbitt v. Fidelity Trust Co.,[23] and In re Busby's Estate, supra.[24] Some decisions take the last day of the period,[25] and that may well be the right course when the whole property can be sold at one time, for in such cases the trustee cannot be said to be in default till the end of the period. That may also have been the measure in Re Frame, supra,[26] McInnes v. Whitman, supra,[27] and In re Westfield Trust Co., supra.[28] Here, the defendants would have been at fault, had they waited till the end of the period; and, the nearest realization of what they should have done, would be to take the average. However, all this is beside the mark, for my view is not to prevail, and the recovery will be limited to the actual gains, as I have said above.

Several questions remain, of which the first is whether the defendants are liable as guarantors of the recovery against any one of them, who may be unable to respond to the judgment against him for the profits recoverable against him; and similarly as to any recovery against a transferee who was not a bona fide purchaser. We think that they are so liable. All fiduciaries who take part in a conversion are liable jointly and severally for the whole amount; so that, if "Automatic" had sued the defendants for

---

[13] Scott on Trusts § 209.
[14] 288 Ill.App. 500, 6 N.E.2d 451, 467.
[15] 7 Cir., 124 F.2d 809.
[16] 313 Mass. 19, 46, 46 N.E.2d 527.
[17] 344 Pa. 586, 26 A.2d 445.
[18] 245 App.Div. 675, 685, 284 N.Y.S. 153.
[19] 333 Pa. 358, 5 A.2d 208, 122 A.L.R. 793.
[20] 115 N.J.Eq. 611, 172 A. 212.
[21] 117 N.J.Eq. 429, 176 A. 101.

[22] Paul v. Girard Trust Co., supra, 7 Cir., 124 F.2d 809.
[23] 72 N.J.Eq. 745, 66 A. 1076.
[24] 288 Ill.App. 500, 6 N.E.2d 451, 467.
[25] In re Lewis' Estate, supra, 344 Pa. 586, 26 A.2d 445; In re Seamans' Estate, supra, 333 Pa. 358, 5 A.2d 208, 122 A.L.R. 793.
[26] 245 App.Div. 675, 284 N.Y.S. 153.
[27] 313 Mass. 19, 46 N.E.2d 527.
[28] 115 N.J.Eq. 611, 172 A. 212.

the conversion of its funds, it could have held each one for the full amount, though he would have been able to enforce contribution from the others.[29] Although to follow converted funds into any substitutes and reclaim the substitutes as parts of the res, is a remedy different from conversion, and one which in the first instance must be sought against the person who holds the substitute or its proceeds, since all the defendants at bar took part in the purchase of the shares with the converted funds, we see no reason why they should shake off liability for the eventual disposition of the shares. The whole transaction required the cooperation of all for its success; the division of the shares among them was as much a part of it as any other; they selected each other as owners in severalty; and they should be held liable for any defaults of those whom they chose; although their liability is secondary. It is not clear whether in Cahall v. Lofland,[30] the chancellor proceeded on this theory, but that at least appears to have been the effect of his ruling. The defendant, Marie Tracey, was not a bona fide purchaser of the shares which her husband caused to be assigned to her. She knew that the company had paid for them; for not only did she repay it out of the proceeds of her shares, but she had herself executed a note to it. She is therefore equally liable with the directors for any profits she may have received; but, not being a director herself, she is not liable secondarily. Moreover, in computing her profits upon 30,000 of the 71,500 shares she may use as the minuend, not the price which she received on sale, but $2.25, the average of the two options which her husband surrendered as part of the transaction of April 26, 1943. Indeed, she has been already allowed to do this in the judgment on appeal.

We agree that it was a justifiable use of "Automatic's" credit to lend it to the eight "key" employees of "Majestic," in order to give them an interest in "Majestic's" business. "Automatic" had a vital interest of its own in "Majestic" to protect, and the risk involved in using its funds for the purpose was a fair exercise of the directors' judgment. There can be no doubt whatever of this except as to Cora Casagrande, to whom 10,000 shares were allotted; she was the wife of the executive vice-president who directed that the shares should be given to her. The stake in "Majestic" which he so obtained was not unreasonably large.

The defendant, Kuth, through his attorneys, submitted generally to the jurisdiction of the district court, when they presented the settlement to the court for approval. It is true that in the passage, which we quote in the margin,[31] he tried to limit his submission to the money and the certificates which had been deposited in escrow; but the limitation was invalid. Having appeared in the action to secure a compromise, he had appeared for all purposes, and it was in vain that he attempted to circumscribe the court's power to dispose of the whole controversy on the merits.[32] The argument that the cause of action was changed by the intervention of the plaintiffs, Miller and Smigel, is so untenable as to require no more than this al-

[29] Scott on Trusts § 258.

[30] 12 Del.Ch. 299, 114 A. 224.

[31] "If the court shall not approve the proposed settlement or if the judgment approving the settlement shall be reversed on appeal and it shall become necessary to resort to litigation in the aforesaid action, the individual defendants agree that the escrow agent shall deliver and pay over such sums of money and such stock certificates in accordance with the final adjudication of the obligations of the parties rendered by the court of last resort having jurisdiction thereof within five days after such final adjudication has been obtained.

"3. This offer and all proceedings connected therewith shall be without prejudice and shall not be used in any subsequent proceedings, in the event that the offer shall not be approved or the settlement not consummated."

[32] Massachusetts Bonding & Insurance Co. v. Concrete Steel Bridge Co., 4 Cir., 37 F.2d 695; Manning v. Furr, 62 App. D.C. 281, 66 F.2d 807; Feldman Inv. Co. v. Connecticut General Life Ins. Co., 10 Cir., 78 F.2d 838; Jos. Riedel Glass Works, Inc., v. Keegan, D.C.D.Me., 43 F.Supp. 153; Maryland Casualty Co. v. Bank of Murdock, 76 Neb. 314, 107 N.W. 562; Henderson v. Henderson, 247 N.Y. 428, 160 N.E. 775; In re Quick's Estate, 161 Wash. 537, 297 P. 198.

lusion. Furthermore, it was enough to charge him on the merits that Franklin telephoned him in Cleveland from Chicago on the evening of the 20th and told him what the directors had done, and that he assented, for he knew that "Automatic" was to "finance" the purchases (action which incidentally he himself admitted on the stand that he knew to be improper). That assent associated him as much in the abstraction of the funds as though he had actually voted for the resolution at the time.[33] Indeed, he might even have made himself liable without actual knowledge, had he merely neglected his duty as a director to keep advised of what his fellows were doing.[34]

Judgment reversed; cause remanded for further proceedings in accordance with the foregoing opinion.

AUGUSTUS N. HAND, Circuit Judge.

I agree with the holding announced in the opinion of Judge L. Hand and with the view expressed that there was no conversion of corporate securities but that there was a misappropriation of corporate funds. I only differ with his personal view as to the amount of recovery and add this memorandum to state why Judge Chase and I hold that in case of such a breach the liability should be limited to profits. The breach that is the basis for granting any recovery in this case was the use of corporate funds for the directors' personal benefit. These funds have been repaid with interest so there has been no damage to the corporation, but the wrongdoers should also pay over all profits so that they will not be permitted to benefit in any manner by their wrong. It is to be noted that in the decisions where fiduciaries have been held liable for converting funds none has been found which has required them to do more than to repay the moneys with interest and in addition to turn over any profits received, including any property still

retained in which the funds have been invested. We see no reason for extending the purpose of a constructive trust so as to impose a greater liability upon a fiduciary for misappropriating funds than upon any other person who commits the same wrong. The creation of such a trust is only to afford a remedy to reach the avails of property unlawfully appropriated. The directors did not intend to hold these securities for Automatic nor did the latter ever invest in the securities on its own account but, on the contrary, objected to acquiring them. Nor can we see any policy which justifies the imposition of a serious liability which we think would employ a fiction to superimpose upon a constructive trust an obligation of an express trust to sell trust property which has no basis in the actual facts of the case at bar and is unnecessary either to restore the corporation to the position it would have been in had its corporate funds not been converted or to prevent profits from being realized by unfaithful directors. Where damages for a breach of a duty to sell corporate assets have been awarded, they were to recompense the corporation for an actual loss sustained and directly caused by the fiduciary's breach. The corporation in the case at bar has lost no such sum as it would recover if a theoretical duty to sell were imposed upon the directors; nor have the defendants received any such gain. If the corporation had owned this property, the directors would be liable for damages if they failed to act as prudent managers; but this was not the case here and we therefore do not believe that they were under such obligations. As constructive trustees we think their responsibility stopped with accountability for the principal sum, interest, and any actual profits realized.

CHASE, Circuit Judge, concurs in this opinion.

[33] Spiegel v. Beacon Participations, 297 Mass. 398, 8 N.E.2d 895; Walker v. Man, 142 Misc. 277, 285, 253 N.Y.S. 458; Broderick v. Marcus, 152 Misc. 413, 418, 272 N.Y.S. 455; Braman v. Westaway, Sup., 60 N.Y.S.2d 190, 199.

[34] Kavanaugh v. Commonwealth Trust Co., 223 N.Y. 103, 119 N.E. 237.