## REITER–FOSTER OIL CORP. v. BENNETT et al.

United States District Court
S. D. New York.

May 15, 1952.

Levien, Singer & Neuburger, New York City, Seligson, Morris & Neuburger, New York City, Charles Seligson, J. Lincoln Morris, and David Sive, all of New York City, of counsel, for plaintiff.

Archibald Palmer, New York City, for all defendants but Continental Bank & Trust Co., of New York.

Holtzmann, Wise, Shepard, Houghton & Kelly, New York City, Frank P. Broz, George J. McDonnell, New York City, for Continental Bank & Trust Co. of New York.

McGOHEY, District Judge.

This is an action to recover certain oil and gas properties in Texas, and for an accounting.

The plaintiff is a Delaware Corporation. The individual defendants are citizens and residents of New York. The defendants Federal Oil and Gas Industries, Inc., and

Bennett Oil and Refining Company[1] are Texas Corporations. The defendant Continental Bank and Trust Company is a New York Corporation. The amount in controversy exceeds $3,000.

The case was tried to the Court whose detailed findings of fact and conclusions of law are filed herewith.

Judgment is granted to the plaintiff.

The relations between the parties from which this action results began in the fall of 1943, when the plaintiff's then president, Sidney F. Kenton, first met the defendant Frank W. Bennett. The plaintiff, whose business consisted in the acquisition and development of oil and gas properties and royalties, was then in financial straits. Its stock transfer agent was the Register and Transfer Company, to which it was indebted for past due accounts. These together with other unpaid obligations amounted to about $5,000, which the plaintiff was unable to pay. It does not appear for how long this condition had existed, but it was apparently causing some concern to the transfer company's president. In order to help the plaintiff raise capital, he arranged to have Kenton meet Bennett who he said was interested in investing in oil companies. Almost at once, the plaintiff became an object of that interest. Oil companies, however, were not Bennett's sole concern. He was also interested and active in the sale of securities, a business which he conducted through several corporations and particularly one known as Frank W. Bennett & Co., Inc., at 30 Broad Street, New York City. His Broad Street office was also the office of a long list of other corporations which, if not wholly owned by him, were concededly so under his control that each in truth was merely Frank W. Bennett acting under a different name. During the period of his relations with the plaintiff he formed two new corporations, the defendants Federal Oil and Gas Industries, Inc., and Bennett Oil and Refining Company, for the precise purpose of holding and operating the properties which are the subject of this suit. Bennett owned and wholly controlled these two corporations. Although Bennett never held office of any kind in the plaintiff corporation, those who did accepted without question his representations on investments and submitted completely to his direction. He first caused his personal selections, some of whom were his employees, to be elected to the plaintiff's Board of Directors. Then he caused Kenton to resign as president so as to make room for J. R. Cosden, Jr., whom he selected and caused to be elected president. At the same time he caused Kenton to be elected vice president. Bennett fixed the salaries of both. Every investment which the plaintiff made after September, 1943, was selected by Bennett, made pursuant to his advice, on terms arranged by him and financed with money raised by the sale of capital stock to or through him or his various corporations. Shortly after his advent into the plaintiff's affairs, Bennett caused the plaintiff's attorney to sublease space in the Bennett suite at 30 Broad Street. Thereafter he issued all instructions to the attorney concerning the plaintiff's investments and the preparation of the documents relating thereto. He also fixed the attorney's fees. This attorney prepared all the corporate minutes of the plaintiff, usually after consultation with Bennett. And on many occasions Bennett also channeled his instructions to the plaintiff's officers and directors through this attorney. Moreover, while he was under retainer from the plaintiff, this attorney was also retained by Bennett personally and by some of Bennett's wholly owned corporations.

From September, 1943, up to July, 1947, all capital stock which the plaintiff sold was sold to Bennett, except 180,000 shares purchased directly from the plaintiff by three persons whom Bennett had interested in the plaintiff corporation. Later Bennett acquired most of these shares as well. Bennett, however, did not hold any of plaintiff's stock for himself but resold it all to

1. Bennett Oil and Refining Company is concededly owned and controlled by the defendant Frank W. Bennett. At the close of the evidence, the complaint was amended on consent so as to name Bennett Oil and Refining Company a party defendant.

the public at a profit. Nevertheless Bennett, in fact, completely controlled the plaintiff, selected all its investments, and conducted all its investment transactions, particularly those connected with the purchase of the properties involved in this action.

These began in the early spring of 1947 and continued through July of that year. Four properties are involved. They are known respectively as the Josey-Richardson, the Shelley-Ryals, the Mission River and the Clymore and Refugio properties. The first time Bennett discussed any of these with Cosden and Kenton was in late May or early June, 1947, at the Sherry Netherland Hotel in New York, where Bennett maintained an apartment. Cosden and Kenton were present by Bennett's invitation which was in effect a summons. Bennett mentioned only the Josey-Richardson property. He said he was going to buy it but would give the plaintiff an interest in it at cost. He said the property was wonderful; that it had substantial oil reserves; that it would yield a good income; but that at the moment he was unable to say just how large an interest he would be able to let the plaintiff have. Shortly after this conference, and on or about June 3, 1947, Bennett again called Cosden and Kenton to meet him, this time at his Broad Street office. There Bennett said he wanted to consider with them how much of plaintiff's stock would have to be sold in order to raise money for plaintiff's purchase of an interest in the Josey-Richardson property. Within the next ten days Bennett bought from the plaintiff 230,000 shares of stock at the aggregate price of $119,800. It was not until the end of June or early July, 1947, that he informed the plaintiff's officers orally that the plaintiff was to get a one-half interest in the Josey-Richardson property for $280,000. He said the total cost was $560,000. He made no mention of a mortgage on the property and so the plaintiff's officers justifiably assumed that there was to be none. The plaintiff was to pay $140,000 in cash on or before receipt of a conveyance of its one-half interest. For the balance of the price it was to give its note for $140,000 at 5% secured

by a proportion of the earnings from its one-half interest. These general terms were reduced to writing by Bennett in a letter agreement dated July 10, 1947, addressed to the plaintiff. They were accepted in writing by the plaintiff. There is no mention of a mortgage in this letter. The plaintiff paid to Bennett through his corporations a total of $140,000 in various amounts as called for by him. The letter agreement also provided that conveyance of the plaintiff's one-half interest would be effected by a "definitive agreement" to be prepared and executed later at which time the plaintiff was to deliver its promissory note for $140,000, the balance of the purchase price of its one-half interest.

The "definitive agreement" was not presented to the plaintiff's officers until some time in November or December, 1947, when one of Bennett's employees brought a copy of it to the plaintiff's office for execution. The plaintiff's officers then discovered for the first time that the property was subject to a mortgage in favor of Massachusetts Mutual Life Insurance Co. as security for a loan of $1,400,000 made on or about July 18, 1947 to the defendant Federal Oil and Gas Industries, Inc. This mortgage covered not only the Josey-Richardson property in which the plaintiff was buying a one-half interest, but also the Shelley-Ryals, Mission River and Clymore and Refugio properties as well.

At no time while negotiations for the plaintiff's purchase of the one-half interest in the Josey-Richardson property were being discussed and arranged by Bennett did he disclose to the plaintiff's officers that the plaintiff's interest was to be subject to a mortgage of any kind. Bennett testified at the trial that he had told Cosden and Kenton orally about the blanket mortgage. They deny that he did. I do not believe Bennett's testimony on that point. I do believe theirs. At all events, the letter of July 10, which Bennett prepared and sent to the plaintiff, contains no mention of a mortgage. This letter was the first written statement of the terms of plaintiff's proposed purchase. Bennett, as his testimony amply demonstrates, was a man of wide experience in the purchase and sale of oil

properties. Moreover, he had the assistance of counsel [2] in preparing the letter of July 10. It is inconceivable that in writing out for the first time the main terms and price of the plaintiff's purchase, he would forget to mention so important a matter as a lien for almost a million and a half dollars.[3] The omission was clearly deliberate, because disclosure then of the true state of affairs would have exposed Bennett's plan by which, without spending any of his own funds, he used the plaintiff's $140,000 to get for himself the undivided title to the Shelley-Ryals, Mission River and Clymore and Refugio properties, as well as one-half of the Josey-Richardson property. It was not until Bennett submitted the so-called definitive agreement to the plaintiff that its officers learned that Bennett had acquired title to the three other properties in the name of his wholly owned corporation, the defendant Federal Oil and Gas Industries, Inc. The plaintiff's understanding had been that Bennett was buying only the Josey-Richardson property; that he was buying it for himself and the plaintiff jointly; that each was to have one-half interest and each was to pay one-half of the cost. Relying entirely on Bennett's good faith and in customary obedience to his direction of its affairs, it accepted his representation that the cost of the Josey-Richardson property was $560,000. However, the true cost, as the proof shows, was only $200,000. Bennett never disclosed his negotiations for the other three properties. Neither did he disclose that he was using only the plaintiff's money, together with the amount of the loan secured by the mortgage, to buy for himself these three other properties.

As it turned out, Bennett obtained not only all these properties but, in addition, about four hundred thousand dollars which was available for their development. And for all this he had not spent one dollar of his own money.

When the so-called definitive agreement revealed the truth about the properties in suit, the plaintiff refused to accept that agreement and has never executed it. Biel, the attorney, was instructed so to advise Bennett and to demand performance by Bennett according to the terms of the letter of July 10, 1947. Biel thereafter reported that he was unable to reach Bennett, who in any event has never complied with that agreement. The plaintiff has received nothing for its $140,000.

Bennett's position at the trial was that, since he was neither an officer nor a director of the plaintiff, he could not and did not in any sense dominate the plaintiff; that he merely sold its stock to secure capital and, through his experienced advice freely given, helped it to secure good investments and make money. He claims that at all times he dealt at arm's length with the plaintiff through its officers and directors. The evidence, however, particularly Bennett's own testimony, is clearly to the contrary. In December, 1945, when Bennett invited Cosden to become the plaintiff's president and caused the directors to elect him, he admonished Cosden that he, Bennett, would "call the signals" for the plaintiff. This commitment, at least, Bennett discharged with an undeviating fidelity worthy of a nobler purpose. He did indeed "call the signals." More-

2. This was William Biel, Esq., then under retainer from the plaintiff as its attorney. On July 10, moreover, Bennett paid Biel $5,000 for various legal services which, Bennett testified, may have included the preparation of this letter.

3. Bennett testified that in orally outlining the purchase of the Josey-Richardson property to Cosden and Kenton he told them it would be financed in the same manner as the "Falling Rock deal." This was a transaction engineered by Bennett in March, 1947, whereby the plaintiff bought from Seatex Oil Company (another of Bennett's corporations) a one-eighth interest in some oil lands in West Virginia. In that transaction the property was subject to a blanket mortgage covering other properties as well, in favor of Massachusetts Mutual Life Insurance Company to secure a loan of $1,500,000 to Seatex. In that instance, however, Bennett made full disclosure of the mortgage to the plaintiff's officers, who discussed it at the meeting of the plaintiff's directors. The minutes of the directors' meeting of March 7, 1947, which were prepared by the plaintiff's attorney at Bennett's direction, record this.

over, he personally executed the plays; permitting the plaintiff's officers and directors to perform only such ministerial details as were needed to maintain the illusion that they and not he were managing its affairs.

That Bennett was neither an officer nor director in no way lessened his power. Neither did it affect his legal relations to the plaintiff. It is of no consequence that he held no office. He had the control, confidence and obedience of those who did. He issued the directions, they obeyed them. His control was actual and complete. That is enough.[4] In no sense can his dealings with the plaintiff be said to have been at arm's length. Bennett's relation to the plaintiff was, by every test, clearly that of a fiduciary. He was, therefore, forbidden "many forms of conduct permissible * * * for those acting at arm's length," and was held to "the punctilio of an honor the most sensitive".[5] As a fiduciary, Bennett was not permitted to make a profit for himself out of a violation of his duty to his beneficiary. In dealing with the plaintiff for his own account, Bennett was bound to disclose every material fact which he knew or was charged with knowing. Under no circumstances was he permitted, as he did, to misappropriate the plaintiff's funds.

The plaintiff then is not relegated to mere rescission and repayment of its $140,000. Indeed it is surprising that such a proposition should be seriously urged. The plaintiff clearly is entitled to "follow and reclaim the abstracted funds in any form they may take, however enhanced in value."[6] And it is also clearly entitled to recover all profits made by Bennett from the misappropriation of its funds so that "[he] will not be permitted to benefit in any manner by [his] wrong."[7]

Accordingly, judgment is granted to the plaintiff for all the relief prayed for in the complaint.

Submit decree.

4. See Southern Pacific Co. v. Bogert, 250 U.S. 483, 492, 39 S.Ct. 533, 63 L.Ed. 1099.

5. Meinhard v. Salmon, 249 N.Y., 458, 464, 164 N.E. 545, 546, 62 A.L.R. 1.

6. Marcus v. Otis, 2 Cir., 168 F.2d 649, 654.

7. Marcus v. Otis, 2 Cir., 168 F.2d 649, at page 660.